[No. 11586.   Department Two. — November 26, 1889.]

R. N. GRAVES ET AL., RESPONDENTS, v. MONO LAKE HYDRAULIC MINING COMPANY, APPELLANT.

CORPORATION — POWERS OF DIRECTORS — FIDUCIARY RELATIONS — CONSTRUCTION OF CODE. — Sections 2230 and 2234 of the Civil Code, making it a fraud upon a beneficiary for a trustee to act where he has an interest adverse to the beneficiary, without his deliberate and uninfluenced sanction, apply to the directors of a corporation in their relation of trustees of the stockholders; and in connection with section 2322 of the same code also apply to them in their relation of trustees of the corporation as respects their general authority to act in its behalf.

ID. — VOTE OF INTERESTED DIRECTORS — HONESTY OF ALLOWANCES. — Resolutions passed by the vote of interested directors of a corporation making allowances in their own favor are voidable at the election of the corporation, or at the election of a minority of the stockholders, if the corporation refuses to avoid them, without regard to whether they were fair and honest or not. The evidence in this case reviewed, and held insufficient to prove the fairness and honesty of certain allowances voted by the directors to themselves.

ID. — CLAIMS OF DIRECTORS — PLEADING — QUANTUM MERUIT — FORECLOSURE OF MORTGAGE TO DIRECTORS. — In a proper case, and upon a proper showing, the directors of a corporation may recover upon a *quantum meruit* the value of services rendered and advances made by them to the corporation; but if no such case is made in the complaint, and the only cause of action alleged is the foreclosure of a mortgage executed to the trustees of the corporation to secure claims allowed by their interested votes, and the execution of which was induced by them in violation of section 2230 of the Civil Code, the corporation may repudiate the note and mortgage, leaving the mortgagees to such remedy as each may be entitled to in another action upon *quantum meruit* allegations.

ID. — RATIFICATION OF MORTGAGE BY STOCKHOLDERS. — The finding in this case that the mortgage of the corporation defendant to its directors was duly ratified by the holders of two thirds of the stock is not justified by the evidence.

ID. — PRESUMPTION FROM CANCELLATION OF STOCK — TRANSFER OF STOCK BY DELIVERY. — The inference from the cancellation of certificates of stock on a certain day is not that the original owner held them until that day, but that he may have assigned them at some uncertain date prior to their cancellation. Certificates of stock indorsed in blank by the owners pass by mere delivery, without further indorsement or transfer on the books of the corporation, although they are not negotiable securities in the commercial sense, or within the definition of the Civil Code.

NEGOTIABLE PAPER — NOTE NOT PAYABLE TO ORDER. — A note payable to certain specified payees in certain proportions, without specifying that it is payable to their order or to bearer, is not a negotiable promissory note.

ID. — ASSIGNMENT AFTER MATURITY. — An assignment of a note by the payee after maturity is subject to all equities and defenses of the maker against the payee.

APPEAL from a judgment of the Superior Court of Mono County, and from an order refusing a new trial.

The facts are stated in the opinion.

*William F. Gibson,* and *William O. Parker,* for Appellant.

*W. E. F. Deal,* and *A. Packard,* for Respondents.

VANCLIEF, C.— The defendant (appellant) is a mining corporation organized in this state October 4, 1881, having its principal place of business in San Francisco, and its mining land and works in the county of Mono.   Its capital stock is one million dollars, divided into one hundred thousand shares, all of which was subscribed by and issued to the following persons: —

John D. Wilson, 24,950 shares; Daniel E. Jones, 24,950 shares; John Elbert, 24,950 shares; N. K. Grant, 24,950 shares; John F. Curtis, 100 shares; George Duncan, 100 shares.

The directors during the first year, named in the articles of incorporation, were said Wilson, Jones, Elbert, Curtis, and Duncan.   Wilson was elected president, Elbert secretary, and Jones superintendent of the mine.

By article 7 of the by-laws it is provided that " members of the board of directors shall receive no compensation for their services as such, nor shall the company be held liable for any services rendered, except it is so expressly provided, but members of the board shall be allowed their reasonable traveling expenses when actually engaged in the business of the company, to be audited and allowed as in other cases of demands against the company.   The secretary and superintendent shall receive such compensation for their services as the board of directors shall determine."

At a meeting of the board of directors held on the twenty-first day of October, 1882, at which only Wilson, Duncan, Jones, and Elbert were present, on motion of Duncan, seconded by Jones, the following resolution was passed:—

"*Resolved*, That the salaries of the president, secretary, and superintendent be and are fixed at one hundred and fifty dollars per month, to date from October 1, 1881, and the secretary be and hereby is instructed to pass to the credit of each of the above-named officers said

amount, and to pay the same *pro rata* from the first funds available."

Immediately thereafter, at the same meeting, the "secretary reported that the company was indebted to J. D. Wilson $10,185.26, to J. Elbert $10,185.26, and to D. E. Jones $8,871.08, for moneys advanced to pay the running expenses of the mine." " Whereupon, on motion of George Duncan, seconded by D. E. Jones, it was resolved that the claims of J. D. Wilson, J. Elbert, and D. E. Jones for moneys advanced this company as above stated be and the same is hereby approved, and the treasurer is hereby instructed to pay all or any part of said amounts *pro rata* out of the first funds available, and should any assessment be levied upon the capital stock of this corporation before said accounts are paid, the secretary is instructed to apply any part of said indebtedness toward the payment of such assessment, should the parties so desire."

On the same day (October 21, 1882) a stockholders' meeting was held, at which J. D. Wilson, J. Elbert, Charles H. Sinclair, George Duncan, and L. J. Wilson were elected directors, who appointed J. D. Wilson president, Charles H. Sinclair vice-president, J. Elbert secretary and treasurer, and D. E. Jones superintendent.

At a special meeting of the last-named directors, held on the thirteenth day of November, 1882, " C. H. Sinclair, vice-president, in the chair, George Duncan and L. J. Wilson present, L. J. Wilson was appointed secretary *pro tem*. The vice-president notified the board that Messrs. Jones, Wilson, and Elbert called for the money due them, and insisted on its being paid or secured." Thereupon the following resolutions were offered and adopted: —

" Whereas, this corporation, the Mono Lake Hydraulic Mining Company, is indebted to D. E. Jones in the sum of $8,871.08, to J. D. Wilson in the sum of $10,185.26, and to John Elbert in the sum of $10,185.26, for moneys ad-

vanced, as appears by the books of the corporation, and which moneys are overdue, and the said Jones, Wilson, and Elbert demand to have paid; and whereas, the corporation is without funds to pay said indebtedness, or to pay other existing pressing liabilities and expenses necessary for the protection of its property, and the corporation is in need of the sum of $16,000 to meet said liabilities and expenses; and whereas, the said Jones, Wilson, and Elbert are willing to extend the time of payment of said moneys due them as aforesaid, and the said Wilson and Elbert are willing to advance to the corporation the said sum of $16,000, upon the corporation executing to them its note for the sum of $45,241.60, payable $8,871.08 to said Jones, $18,185.26 to said Wilson, and $18,185.26 to said Elbert, within six months from date, with interest thereon at the rate of one per cent per month, which note shall be secured by a mortgage upon the real property and mining machinery of the corporation in Mono County,—now, therefore, it is—

*Resolved,* That this corporation make, execute, and deliver to said Jones, Wilson, and Elbert its note for the sum of $45,241.60, payable six months after date, and in amounts following: $8,871.08 to Jones, $18,185.26 to Wilson, and $18,185.26 to Elbert, and all payments made on said note to be divided to and among said Jones, Wilson, and Elbert in the proportion of said amounts so due each as aforesaid, and also a mortgage to secure said note duly signed, executed, and acknowledged upon all the real property and mining machinery of the corporation in Mono County, California, and the vice-president of this corporation is hereby directed and authorized in the name of and for the corporation to make, execute, acknowledge, and deliver said note and mortgage to said Jones, Wilson, and Elbert, affixing to each the corporate name and seal of this corporation."

On the same day (November 13, 1882) the note and mortgage were executed for the corporation by Charles

H. Sinclair, the vice-president.    The following is a copy of the note:—

" $45,241.60.

" SAN FRANCISCO, November, 13, 1882.

"Six months after date, for value received, the Mono Lake Hydraulic Mining Company, corporation, promises to pay to D. E. Jones, J. D. Wilson, and John Elbert the sum of forty-five thousand two hundred and forty-one and sixty one-hundredths dollars (being eight thousand eight hundred and seventy-one and eight one-hundredths dollars to D. E. Jones, eighteen thousand one hundred and eighty-five and twenty-six one-hundredths dollars to J. D. Wilson, and eighteen thousand one hundred and eighty-five and twenty-six one-hundredths dollars to John Elbert), with interest thereon at the rate of one per cent per month from date until paid.  Any payments on this note are to be divided to and among the said Jones, Wilson, and Elbert in proportion to their respective amounts as aforesaid.

" MONO LAKE HYDRAULIC MINING COMPANY,
"By CHAS. H. SINCLAIR,
[Corporate seal]          " Vice-president."

On the third day of March, 1883, J. D. Wilson applied to Albert Packard, one of the plaintiffs, for a loan of money, offering to assign to Packard his (Wilson's) interest in said note and mortgage as collateral security for the payment of the loan.   As a condition of the loan on the security offered, Packard required a ratification of the mortgage by the stockholders of the corporation; whereupon J. D. Wilson and John Elbert as stockholders executed an instrument in writing, which, after reciting the execution of the note and mortgage, proceeded as follows:—

"Now, therefore, we, J. D. Wilson, as owner and holder of twenty-five thousand shares of the capital stock of said company, and John Elbert, as owner and holder of

forty-five thousand shares of the capital stock of said company, which consists in the aggregate of one hundred thousand shares, do hereby ratify and affirm said mortgage.   In witness whereof, we have hereunto set our hands this third day of March, 1883.

"J. D. WILSON.
"JOHN ELBERT."

After this ratification, and on the same day, Packard loaned Wilson six thousand dollars, for which he took Wilson's note for seven thousand dollars payable March 13, 1884, with interest at the rate of one per cent per month, and as collateral security Wilson then assigned to Packard all his interest in the note and mortgage of the defendant corporation of November 13, 1882.

On August 21, 1883, Packard held notes of the defendant corporation, which had been made or assigned to him, amounting to $6,738.96, and which, at the request of J. D. Wilson, he surrendered to the corporation, and in lieu thereof took the note of J. D. Wilson and John Elbert for the amount ($6,738.96), and as collateral thereto, Wilson and Elbert, "by way of mortgage," assigned to Packard all their interest in the note and mortgage of the defendant of November 13, 1882. Among the notes surrendered as aforesaid by Packard was one made to him for two thousand five hundred dollars, bearing interest at one per cent per month, the consideration for which was only two thousand dollars, the additional five hundred dollars being a bonus to Packard.

On the twentieth day of February, 1883, John Elbert assigned all his interest in the note and mortgage of the defendant of November 13, 1882, to D. E. Jones, "by way of mortgage," to secure payment of his note to Jones for $9,185.26, payable May 13, 1884, with interest at one per cent per month.

On March 18, 1884, D. E. Jones, by an instrument in writing, absolute upon its face, expressing a considera-

tion of twelve thousand dollars, assigned to the plaintiff, R. N. Graves, all his right, title, and interest in the note and mortgage of the defendant corporation, dated November 13, 1882.

This action is brought by Packard and Graves, as assignees of Wilson, Elbert, and Jones, to foreclose the mortgage of the defendant to them of November 13, 1882.

The answer of defendant denies the execution of the note and mortgage; denies the ratification of the mortgage by two thirds of the stockholders; denies that the defendant was indebted to Wilson, Jones, or Elbert in any sum or sums exceeding $200 to Jones, $3,724.20 to Wilson, and $3,724.20 to Elbert; and alleges that neither of these sums was due or payable, or to become due or payable, until by assessments or proceeds of the mine the defendant should have available funds in its treasury to pay the same; alleges that on October 21, 1882, and for six months thereafter, Wilson, Jones, and Elbert were the acting officers and managing agents of the defendant, managing all its business and affairs, and occupying fiduciary relations to the defendant and to its stockholders, and controlling the board of directors of the corporation; that they conspired together to cheat and defraud the defendant and its stockholders, by obtaining evidence of indebtedness that did not exist, and to which they knew they were not entitled; that in pursuance of this conspiracy they procured the passage of the resolutions of the board of directors of October 21, and November 13, 1882, and the execution of the note and mortgage in suit, without any consideration therefor; and that the plaintiffs took the assignments of the note and mortgage with notice of the facts above stated.

The trial court found for the plaintiffs on all the material issues, and ordered a sale of all the real property described in the complaint, to pay the principal and interest due on the note and mortgage, and plain-

tiffs' costs and attorney's fees, which are found by the court to amount to $59,354.69.

The defendant appeals from the judgment, and also from an order denying its motion for a new trial, and relies mainly on the ground that material findings of fact, necessary to support the judgment, are not justified by the evidence.

The case seems to have been tried by plaintiffs' counsel on the theory that although Wilson, Elbert, and Jones were directors and managing agents of the corporation, and trustees of the stockholders, on October 21, 1882, when their several demands were audited and allowed, and also on November 13, 1882, when the vice-president — Sinclair — was authorized to execute, and did execute, the note and mortgage for the sum of those demands, and sixteen thousand dollars in addition thereto, yet they did not represent or improperly influence their principal (the corporation) in those transactions, and that they dealt fairly and honestly with it, while it was properly represented by other agents who were not interested in the debts allowed and secured, and therefore that the note and mortgage were not voidable at the mere election of the defendant, without regard to the fairness and honesty of the transactions which induced their execution, but were enforceable by proof on the part of the plaintiffs that they had been fairly and honestly obtained. And accordingly it appears that plaintiffs' counsel assumed the *onus* of proving not only the execution of the note and mortgage, but also the fairness and honesty of all transactions leading to their execution or involved therein.

Counsel for appellant contends that the judgment cannot stand, even upon the theory of respondents' counsel above indicated, for the reason that the findings of fact supporting that theory are not justified by the evidence. They further contend that in passing the resolutions of October 21 and November 13, 1882, ad-

mitting and allowing the demands for which the note
of the latter date was given, and in authorizing the exe-
cution of the note and mortgage, Wilson, Elbert, and
Jones really and substantially represented and controlled
the defendant, and therefore that the defendant has
properly elected to avoid and repudiate the note and
mortgage, regardless of the honesty or dishonesty of the
transactions which led to their execution. And they
further contend that the mortgage was not ratified by
the holders of two thirds of the stock of the corporation,
and is therefore void.

As to the fairness and honesty of the resolution of
October 21, 1882, by which it was made to appear that
the corporation acknowledged itself indebted to Wilson,
Elbert, and Jones in the sum of $29,241.60 " for moneys
advanced to pay the running expenses of the mine," it
is to be observed that the allowance of one year's back
salaries to Wilson, Elbert, and Jones, amounting to five
thousand four hundred dollars, and constituting a part
of the indebtedness, was not shown to have been war-
ranted by the by-law above set out, nor to have been
just or equitable.

The plaintiffs, as they were bound to do, attempted to
prove the services and the value thereof, for which these
salaries had been allowed; and for this purpose called
Mr. Jones, the superintendent, who resided in Mono
County, and was seldom in San Francisco, where the
office of the company was kept, and where Mr. Wilson
and Mr. Elbert must have rendered the greater portion
of those services. Being asked if Mr. Wilson rendered
any services outside of the performance of his duty as
president and director, Mr. Jones answered, " Yes, sir."

" Q. How much of his time was occupied outside of
his duties? A. I think he put in his whole time visit-
ing the mine, etc., and helped every way he could to
make it a success.

" Q. Do you know the reasonable value of those ser-

vices? A. I do. I think about $150 a month. I was
interested, and thought he earned it."

Being asked what was the value of Mr. Elbert's ser-
vices "outside of his duties as secretary and treasurer,"
he answered: "Outside and with secretary, $150 per
mouth; . . . . well, he was busy all the time; he put in
all his time, and we were certainly willing to allow him
$150 a month." On cross-examination, being asked
what any of the directors did in the management of the
business of the corporation, he answered: "I don't know.
I was up in the mountains. The books will show. I
ain't keeping any books." There was no other evidence
tending to prove what services were rendered by Messrs.
Wilson and Elbert; and no evidence whatever to prove
the services, or value of services, rendered by Mr. Jones,
except that he was superintendent. Mr. Elbert was not
called as a witness for any purpose; and although Mr.
Wilson testified at the trial as to other matters, he was
not asked and did not testify as to his services, or the
services of Elbert or Jones. Under the peculiar circum-
stances of this case, the evidence was unsatisfactory and
insufficient to prove that these officers of the corporation
had performed services in one year, over and above
their duties as directors, of the value of five thousand
four hundred dollars, and that they, as such officers,
had fairly and honestly charged the corporation with
that sum by the resolution of October 21, 1882, passed
by their own votes.

Another item which constituted a part of the indebt-
ness was $12,633, proceeds of sales of the "Grant stock,"
which had been applied to the use of the corporation.
By the resolution of October 21, 1882, this sum was
charged to the corporation, and credited to Wilson, El-
bert, and Jones,—one third of it to each. This stock,
called the "Grant stock," about twenty thousand shares,
was purchased in the fall of 1881 from N. R. Grant (to
whom it had been issued as one of the incorporators),

by Wilson, nominally, and paid for with money realized from sales of a portion of the same stock. This stock was delivered to the secretary,—Elbert,—and sold by him in small lots to different persons prior to February, 1882. The appellant contends that prior to the sale of this stock by the secretary, and while Wilson, Elbert, and Jones owned all the stock except two hundred shares (held by the other two trustees), they agreed with each other to set it aside as working capital of the corporation, and to apply the proceeds of the sale thereof to the payment of the expenses of opening and improving the mine until it should become self-sustaining; and then, if there should be any residue, to divide it equally between them; and that the purchasers of the "Grant stock" were informed of this agreement, and promised by Elbert and Wilson, at the times of their several purchases, that there should be no assessment on stock until after the proceeds of the "Grant stock" should be exhausted.

J. D. Wilson testified that such was the understanding between Elbert, Jones, and himself; and his testimony as to this was strongly corroborated by the following-named witnesses, most of whom had purchased portions of the "Grant stock": J. C. Winans (secretary of the company for a time), Charles H. Sinclair (director and vice-president), Thomas S. Russell (director until after October 21, 1882), E. S. Paddock, George Bill, and Joseph Wilson. An account of the receipts from the sales of the "Grant stock" was entered in the cash-book,—the only book of accounts kept by the company,—but neither Wilson, Elbert, nor Jones was credited with any part of the receipts from such sales before October 21, 1882. Jones, however, testified positively that no agreement or understanding ever existed to the effect that any part of the "Grant stock" should be set aside or used as working capital of the company; but that such stock was the private property of Wilson, Elbert, and

himself. It seems, from the record, that there was a decided preponderance of evidence in favor of the defendant, yet the court found for plaintiffs on this issue.

Another item which entered into and constituted a part of the indebtedness for which the note and mortgage were executed was sixteen thousand dollars which was to be advanced to the defendant " to pay pressing liabilities and expenses necessary for the protection of its [corporation's] property," as expressed in the preamble of the resolution of November 13, 1882. Although this resolution must be understood to mean that Wilson and Elbert were to advance the sixteen thousand dollars immediately after the execution of the note and mortgage "to pay the pressing liabilities," there is no pretense that they advanced a dollar for any purpose before the third day of March, 1883, — three and a half months after the execution of the note and mortgage, — when it is claimed that Wilson borrowed six thousand dollars from Packard and applied it to the payment of the debts of defendant; but it does not appear what debts he paid, and there is no evidence that he applied any part of the six thousand dollars to the payment of such debts or to any use of the defendant, except the testimony of Packard, who says, only, that he was informed by Wilson, Elbert, and Levison, attorney for defendant, that the six thousand dollars had been applied to the payment of the debts of the defendant.

It further appears that, nine months after the execution of the note and mortgage (August 21, 1883), Packard, at request of Wilson, delivered to defendant, through Mr. Levison, notes of the defendant, made to Packard and others, amounting to $6.738.96, and in lieu thereof took the note of Wilson and Elbert for that amount, collaterally secured by an assignment of their interest in the note and mortgage in suit. There was no evidence or pretense of any other advance to defendant, or payment of its debts, by Wilson or Elbert

after the execution of the note and mortgage of November 13, 1882.

The sixteenth finding (not excepted to) is, that "all the moneys loaned by said Packard to said J. D. Wilson and to said John Elbert, represented by said notes of $7,000 and $6,738.96, were paid to defendant, and were used to pay defendant's debts contracted in carrying on its business and working its mines." This finding must be taken as true; but there is no evidence of any loan of money to Wilson or Elbert, except the six thousand dollars for which Wilson gave his note of seven thousand dollars on March 3, 1883. But if we consider the notes of defendant, amounting to $6,738, surrendered by Packard (August 23, 1883), as a loan to Wilson and Elbert, the whole amount loaned to them by Packard would be only $12,738. Deducting from this the interest which the defendant was paying upon its debts (one per cent per month) from November 13, 1882, when the $16,000 should have been advanced, until the debts are alleged to have been paid by Wilson and Elbert ($6,000 March 3, and $6,738 August 21, 1883), amounting to about $750, it will appear that Wilson and Elbert only advanced, by paying debts, what was equivalent to an advance of less than $12,000 on the date of the note and mortgage, when, according to the resolution of that date, the $16,000 should have been advanced. Therefore, beside the difference between advancing sixteen thousand dollars at the date of the note and mortgage and the purchasing of demands against the defendant to that amount three and a half to nine months afterward, we find a deficiency of four thousand dollars in the amount of the demands claimed to have been paid, and consequently an admitted failure of the consideration of the note and mortgage, to that extent at least. But the defendant was not bound to accept the alleged payment of its debts by Wilson and Elbert in lieu of the money that they agreed to advance upon the execution of the note

and mortgage.    (*Davis* v. *Rock Creek L. F. & M. Co.*, 55 Cal. 359; 36 Am. Rep. 40; *Koehler* v. *B. R. F. Iron Co.*, 2 Black, 715; Morawetz on Corporations, sec. 522.)

The fairness, honesty, and good faith of the transactions under consideration are further impeached by the testimony of Charles H. Sinclair, Thomas S. Russell, and E. S. Paddock. Sinclair was first elected a director on October 21, 1882, in place of Jones, but took no part in any business meeting until the meeting of November 13th, at which he was authorized to execute the note and mortgage of that date. He testified that when he was elected he had no experience in the business of corporations; that Mr. Jones, whose place he took on the board of directors, requested him to look out for his interests, and that he (Sinclair) promised Jones that he would do so as if they were his own; that at the meeting of November 13th he was told by Wilson and Elbert that the company owed only about eight thousand or nine thousand dollars, and that the mortgage to them and Jones was to be executed as mere matter of form, to prevent an attachment of the property mortgaged until money could be raised to pay the debts, and that the debts to secure which the note and mortgage were given were fictitious; that Jones, who was not present at the meeting, had told him substantially the same; that Wilson and Elbert, who were then directors, were present at the meeting, and requested that the resolution authorizing the execution of the note and mortgage be passed, and that it certainly would not have been passed without their request; that it was understood that the company would not be compelled to pay the mortgage, and therefore that it would harm nobody; and that while the resolution was being acted upon by the other three directors, Wilson and Elbert retired into an adjoining room as a matter of form.

Thomas S. Russell, who has been a director up to October 21, 1882, testified that he understood in October,

1882, that the company was very little in debt; that he did not understand that it was indebted to Wilson, Elbert, and Jones in the sums mentioned in the resolution of October 21, 1882; and that Elbert had told him that the mortgage was put on to save trouble. It would give them time to raise money to meet whatever obligations there were.

E. S. Paddock, who was a small stockholder, testified, in substance, that Elbert told him that the mortgage was given to protect the property from other debts, as they feared an attachment; that the mortgage would be canceled when the outstanding debts were paid; and that they did not intend to enforce the mortgage.

Jones was called in rebuttal, but did not dispute a word of Sinclair's testimony; nor did Wilson, who was present at the trial.

The sixth finding, to the effect that the "Grant stock" was the property of Wilson, Elbert, and Jones, and that the proceeds of the sale thereof belonged to them, though not satisfactorily proved, would not, in an ordinary case, be disturbed, as the evidence as to it was substantially conflicting; and it may be allowed to stand in this case without affecting the result; and it is therefore unnecessary to decide whether it is justified by the evidence or not.

But the ninth finding, "that on and prior to August 21, 1883, J. Elbert and J. D. Wilson paid, in advance, to defendant, the sum of sixteen thousand dollars, which is included in said note and mortgage, which sum was used by defendant in payment of debts of defendant"; and the tenth finding, that "all transactions between J. D. Wilson, J. Elbert, and D. E. Jones, with reference to said debts and said note and mortgage, were fair and honest, and the making and executing of said note and mortgage were for the benefit of defendant and all its stockholders,"—are not, nor is either of them, justified by the evidence on any theory of law possibly applicable to

the case.  The view most favorable to respondents, and which seems to have been adopted by their counsel, is that the case falls within the first exception to the general rule expressed in section 2230 of the Civil Code, as follows: —

" SEC. 2230.   Neither a trustee, nor any of his agents, may take part in any transaction concerning the trust in which he, or any one for whom he acts as agent, has an  interest,  present or contingent,  adverse to that of his beneficiary, except as follows: 1.  When the beneficiary, having capacity to  contract, with a full knowledge of the motives of the trustee, and of all other facts concerning the transaction which might affect his own  decision, and without the use of any influence on the part of the trustee, permits him to do so."

Section 2234 of the same article provides that "every violation of the provisions of the preceding sections of this article is a fraud against the beneficiary of the trust."

These provisions of the Civil Code expressly apply to the directors of corporations in their relation of trustees of the stockholders, and are made to apply to them *in this case*, as agents of the corporation, by section 2322 of the same code, which provides that " an authority [of an agent] expressed in general terms, however broad, does not authorize an agent . . . . 3.  To do any act which a trustee is forbidden to do by article 2, chapter 1, of the last title " (which title includes the sections above quoted), since it does not appear that the directors of the defendant corporation had any specific authority to deal with it as they are shown to have done in this case; and if they claim authority for their acts, they must claim it under "an authority expressed in general terms"; in which case sections 2230 and 2234 of the Civil Code, in regard to trustees, apply to them as mere agents of the corporation.

Under these conditions, the resolutions of October 21, 1882, allowing and ordering paid to Wilson, Elbert, and

Jones all the indebtedness for which the note and mortgage were afterward given, except the sixteen thousand dollars to be advanced by Wilson and Elbert, cannot be sustained, for the sufficient reason, among others, that it was not a case in which, being interested in the transaction adversely to the corporation, Wilson, Elbert, and Jones merely dealt with it, while it was represented by other agents, but a case in which, as agents of the corporation, they dealt with themselves. They represented both parties to the transaction. Of the directors, only Wilson, Elbert, Jones, and Duncan were present at the meeting that adopted those resolutions. The demands of Wilson, Elbert, and Jones were not considered or allowed separately, but all together in the same resolutions, which could not have been adopted unless at least two of the interested directors had voted for them. Clearly, therefore, the resolutions of October 21, 1882, were voidable at the election of the corporation, or at the election of a minority of the stockholders, in case the corporation had refused to avoid them, without regard to whether they were fair and honest or not. (*Andrews* v. *Pratt*, 44 Cal. 309; *San Diego* v. *S. D. & L. A. R. R. Co.*, 44 Cal. 106; *Wilbur* v. *Lynde*, 49 Cal. 290; 19 Am. Rep. 645; *Chamberlain* v. *Pacific Wool Co.*, 54 Cal. 103; *Tracy* v. *Colby*, 55 Cal. 67; *Wardell* v. *Union Pacific R. R. Co.*, 103 U. S. 651; *Kochler* v. *Black River Falls Iron Co.*, 2 Black, 715; Morawetz on Private Corporations, secs. 516–520.) It is not intended to decide, however, that these directors may not have recovered from the corporation the value of money or property honestly advanced by them, and which had been used by and for the benefit of the corporation in carrying on its business, or the value of services rendered by them outside of the duties of their office, in a proper case and upon a proper showing. The circumstances under which such recovery may be had are indicated in Morawetz on Corporations, sections 526, 715, and 716. But no proper case for such

recovery is made here. Indeed, there is no foundation for it in the complaint. The sole object of the action is to foreclose a mortgage executed to secure the payment of a note alleged to have been made by the corporation to its directors, and by them assigned to the plaintiffs. There is no count for the value of money or property advanced to and used by or for the benefit of the corporation, nor for the value of services rendered by the assignors of the plaintiffs.

In *Gardner* v. *Butler*, 30 N. J. Eq. 702, Van Syckel, J., said: "The rule is, that the trustee cannot fortify himself by a contract which he makes with himself or for his own benefit, and set it up either at law or in equity as a valid obligation. . . . . But while the express undertaking is without legal force, the directors of a company have a right to serve it in the capacity of officers, agents, or employees, and for such services the law will enable them to recover a just and reasonable compensation. . . . . No claim which they may make against their company can acquire any support or validity from the fact that they have expressly sanctioned it; it must rest exclusively upon its fairness and justice, and be enforced upon the *quantum meruit*." The decision of this court in *Wilbur* v. *Lynde*, 49 Cal. 290, 19 Am. Rep. 645, rests upon the principles thus announced by Justice Van Syckel.

The meeting of November 13, 1882, nominally composed of the three directors, Sinclair, Duncan, and L. J. Wilson, which adopted the resolution authorizing Sinclair to execute the note and mortgage, did not pretend to investigate or to pass upon the merits of the demands to be secured by the mortgage. That meeting was notified by the vice-president "that Messrs. Jones, Wilson, and Elbert called for the money due them, and insisted on its being paid or secured." Thereupon the resolution authorizing the note and mortgage was adopted, reciting that the company "is indebted to D. E. Jones

LXXXI. CAL.—21

in the sum of $8,871.08, to J. D. Wilson in the sum of $10,185.26, and to John Elbert in the sum of $10,185.26, for moneys advanced, *as appears by the books of the corporation*,"—that is, by the resolutions of October 21, 1882; for it appears that those sums were never credited on those books until that date. The resolution further recites the need of the sum of sixteen thousand dollars to pay other pressing liabilities of the corporation, and that " Wilson and Elbert are willing to *advance* to the corporation the said sum of sixteen thousand dollars upon the corporation executing to them" the note and mortgage in the form in which they were executed. The resolution only purports to authorize additional security for the debts audited and ordered paid by the resolution of October 21st, adopted by the votes of Wilson, Elbert, and Jones, and also to secure the sixteen thousand dollars to be advanced by Wilson and Elbert; and therefore does not cure the infirmity of the alleged debts theretofore allowed, and evidenced only by the resolution of October 21st. No part of the transactions of November 13, 1882, resulting in the execution of the note and mortgage, appears to have been fair or honest on the part of Wilson, Elbert, and Jones. We have seen that Wilson and Elbert never did *advance the sixteen thousand dollars to the corporation;* that they admitted to Sinclair and others that the debts to be secured by the mortgage were fictitious; that the object of the mortgage was to prevent an attachment of the property, and that they did not intend to enforce it, but would cancel it as soon as money could be raised to pay the other debts. They were present at the meeting immediately before the resolution was offered, and requested its adoption, and retired to an adjoining room while the resolution was being acted upon, as matter of form; and Sinclair testified that the resolution certainly would not have been adopted had they not requested its adoption. If the undisputed testimony of Sinclair is true, Wilson

and Elbert were substantially present when the resolution was acted upon, and influenced its adoption. Their conduct and representations tended to deceive the other three directors as to the true object of the mortgage, and as to their motives in requesting the adoption of the resolution, and also as to their intention to advance the sixteen thousand dollars. That their conduct and representations had this effect is confirmed by the sequel. It is, therefore, quite clear that their conduct in procuring the execution of the note and mortgage does not come within the first exception to the rule provided by section 2230 of the Civil Code, but is governed by that rule. It cannot be said that the corporation, "without the use of any influence" on the part of Wilson, Elbert, and Jones, and "with full knowlege" of their motives, "and of all other facts concerning the transaction which might affect its decision," permitted them so to deal with it. The corporation, therefore, may repudiate the note and mortgage as it has elected to do, thus leaving the respective assignors of the plaintiffs to such remedy as each may be entitled to upon *quantum meruit* allegations.

Finding 11, that the mortgage was duly ratified on the third day of March, 1883, by the holders of two thirds of the stock, is not justified by the evidence.

In the written instrument by which Wilson and Elbert attempted to ratify the mortgage, they declare that Wilson was then the holder of twenty-five thousand and Elbert the holder of forty-five thousand shares of the capital stock of the company. To prove this the plaintiffs called Richard Barnard as an expert book-keeper, who testified that he had examined the defendant's stock-book of certificates, from No. 1 down to and including certificate No. 147, with the stubs and indorsements, for the purpose of ascertaining how many shares of defendant's capital stock were held by Wilson and Elbert on March 3, 1883; that he thereby found that

Wilson held on that day 11,850 shares, of which he gave a list. He also gave a list of certificates and number of shares held by Elbert on that day, as shown by that book, amounting to 38,300 shares. He then gave a list of canceled certificates, Nos. 119, 120, 121, and 122, of 5,000 shares each, and Nos. 124 and 125, of 500 shares each, amounting to 21,000 shares, which he found reattached to their stubs. All these certificates appeared to have been issued to D. E. Jones in October, 1882, and across the face of each was written, "Canceled March. 17, 1883." No. 119 was indorsed: "Transferred Feb. 20, 1883, D. E. Jones, Tr." No. 120, same indorsement. No. 121, same. No. 122 is indorsed: "Transferred Feb. 20, 1884. J. Elbert, Tr.," and "Feb. 20, 1884, D. E. Jones." Nos. 124 and 125 are indorsed simply, "D. E. Jones, trustee," without date. Plaintiffs also put in evidence that part of said certificate and stub-book containing the stubs and canceled certificates thereto attached, from 1 to 147 inclusive, all which are copied into the transcript. It does not appear, however, by the stubs or otherwise, what was the number of the certificate issued in lieu of any one of these six canceled certificates, as the place on the stubs in which this number should have been entered remains blank. Nor does it appear to whom any of the lieu certificates was issued. On the part of plaintiffs, D. E. Jones testified that he assigned and delivered these certificates to J. Elbert absolutely on February 20, 1883. On the part of defendant, J. D. Wilson testified as an expert book-keeper that he had examined said book of certificates and stubs for the purpose of ascertaining how many shares of stock Elbert held on March 3, 1883, and that it appeared from said book that Elbert was the holder of only 37,800 shares on that date. John Elbert was not called and did not testify as a witness in the case, although it appeared by the testimony of J. D. Wilson that he (Elbert) was present during a part of the time, while the depositions of the eight wit-

nesses on the part of the defendant were being taken in
San Francisco, on May 27, 1884, and that witness saw
him in San Francisco on October 1, 1884, seven days
before the commencement of the trial, and so far as
witness knew, Elbert had been in San Francisco all the
time since the taking of said depositions.

In the absence of any other evidence than that of the
assignment of the six certificates in question, by Jones
to Elbert, on February 20, 1883, perhaps the disputable
presumption that Elbert continued to be the holder of
the stock represented by those certificates (twenty-one
thousand shares) on March 3, 1883, might have been
indulged. (Code Civ. Proc., sec. 1963.) But from the
cancellation of those certificates on March 17, 1883,
the inference is, not that Elbert held them until that
day, but that he may have assigned them at some time
prior to their cancellation, and possibly before March 3,
1883 (the date of the alleged ratification). The pre-
sumption, under any circumstances, could only be "that
a thing once proved to exist continues as long as is
usual with things of that nature." There is no evidence
as to how long the assignees of mining stocks usually
hold them, nor as to how soon after assignment the
assignee usually presents the certificates to the corpora-
tion for transfer and cancellation; and since the law
does not fix or limit these times, the court has no means
of ascertaining them, unless it may take judicial notice
of the usual course or mode of such transactions in
mining stocks, which seems to have been done to a limited
extent in *Brewster* v. *Sime*, 42 Cal. 143, which, perhaps,
is of doubtful authority on this point.

But it seems to be settled that certificates of stock in-
dorsed in blank by the owners to whom they issued
pass by mere delivery, without further indorsement, and
without transfer on the books of the corporation, although
they are not negotiable securities in the commercial
sense, or within the definition of the Civil Code. (*Brew-*

*ster* v. *Sime*, 42 Cal. 143; Cook on Stock and Stockholders, sec. 441; *Thompson* v. *Toland*, 48 Cal. 111; *Sherwood* v. *Meadow Valley M. Co.*, 50 Cal. 412; *Winter* v. *Belmont M. Co.*, 53 Cal. 431; *Barstow* v. *Savage M. Co.*, 64 Cal. 388; 49 Am. Rep. 705; *Arnold* v. *Johnson*, 66 Cal. 402.) It follows that Elbert may have assigned the certificates indorsed to him in blank by Jones before the third day of March following by mere delivery; and the same certificates may have passed through several persons in the same manner before the 17th of March, when they appear to have been canceled at the instance of persons not identified by the evidence. Moreover, it is to be observed that the certificate numbered 122 (for five thousand shares) appears to have been indorsed by Elbert on the twentieth day of February, 1884,—the same date of the indorsement by Jones. (The year 1884, instead of 1883, evidently being a typographical error, as Jones testified it was in 1883, and the indorsements were so read by him and by counsel on the trial.) This tends to prove that Elbert assigned that certificate on the same day it was assigned to him by Jones; and deducting the five thousand shares represented by that certificate from the number of shares claimed by respondents to have been held by Elbert and Wilson March 3, 1883, viz., 71,150 shares, would leave them only 66,150 shares, —516 shares less than two thirds of all the stock.

Another circumstance strongly tending to prove that Elbert did not hold the stock in question on the third day of March, 1883, is, that in the instrument of that date by which he and Wilson attempted to ratify the mortgage, he only declared himself to be the holder of forty-five thousand shares, which is fourteen thousand three hundred shares less than was claimed for him on the trial. That instrument was signed only eleven days after the six certificates (twenty-one thousand shares) were assigned to him by Jones. He had been the secretary of the corporation, and appears to have entered

in the book all the issues, transfers, and cancellations of stock up to that time. Under these circumstances, it seems incredible that he underestimated the number of shares then held by him by fourteen thousand three hundred shares, whilst it is admitted that Wilson, in the same instrument, overestimated his by thirteen thousand shares.

Again, it is unaccountable, by the record, that plaintiffs did not call Elbert as a witness, or take his deposition as to this and other important issues of which the burden of proof was upon them, upon any other ground than that they feared, at least, if they did not know, that his testimony would be against them; for it appears *prima facie* that they might have taken his deposition, if they could not have induced him to attend at the trial.

There is nothing in the point that plaintiffs took their respective assignments of the note and mortgage without notice of any defense thereto, since the note is not a negotiable promissory note. (Civ. Code, sec. 3087.) Beside, only Wilson's first assignment to Packard was made before the note became due. The second assignment to Packard by Wilson and Elbert, and the assignment by Jones to Graves, were made after the maturity of the note. Undoubtedly all the assignments to the plaintiffs were without prejudice to the defenses pleaded. (Code Civ. Proc., sec. 368.)

I think the judgment and order should be reversed, and a new trial ordered.

FOOTE, C., and HAYNE, C., concurred.

The COURT.—For the reasons given in the foregoing opinion, the judgment and order are reversed, and a new trial ordered.

Hearing in Bank denied.