### FARMERS' LOAN & TRUST CO. *v.* SAN DIEGO ST. CAR CO.

*(Circuit Court, S. D. California.   March 23, 1891.)*

1. RAILROAD MORTGAGE—FORECLOSURE—INTERVENOR'S EXCEPTIONS TO MASTER'S REPORT.
   In proceedings to foreclose a mortgage on the property of a street railroad, where the bill contains no averment as to the pledging of the bonds, nor as to who were the holders of them, but only alleges that enough of them were outstanding to comply with the provisions of the mortgage as to foreclosure, an intervening petitioner cannot be expected to know these circumstances in advance of the evidence, and the fact that his petition of intervention makes no allegations as to the invalidity of the pledging of the bonds will not preclude him thereby from excepting to the master's report sustaining the validity of such a pledge.

2. SAME—UNAUTHORIZED PLEDGE OF BONDS.
   It appeared upon foreclosure proceedings that the bonds of a street-car company, issued pursuant to a vote of the stockholders, "for the purpose of extending and constructing" the road, purchasing rolling stock and equipments, and paying "for labor done and to be done in the construction" and operation of the road, were never sold to procure funds for these purposes, but that after ineffectual attempts to sell them were pledged by the president and vice-president of the mortgagor to secure antecedent indebtedness of the company, which to a large extent was due to other companies, of which also they were officers and directors. *Held*, that the pledge was without authority, and in fraud of the rights of the stockholders.

In Equity.   Bill for foreclosure.

*Turner, McClure & Rolston* and *Myrick & Deering*, for complainant.
*Brunson, Wilson & Lamme*, for defendant.
*F. W. Burnett*, for intervenor Baines.
*N. H. Conklin*, for intervenor First Nat. Bank of San Diego.
*E. W. Hendrick*, for intervenors Gautner *et al.*
*O. A. Trippet*, for intervenor Fox.
*Noah Hodge*, for intervenors Howard *et al.*
*Collier & Watson*, for intervenor Bidwell.
*A. Haines*, for intervenor J. G. Capron.

Ross, J.   This is a suit in equity, brought by the Farmers' Loan & Trust Company, a corporation organized and existing under the laws of the state of New York, as trustee, against the San Diego Street-Car Company, a street railroad corporation, organized and existing under the laws of the state of California, to foreclosure a mortgage executed by the defendant company on all of its property and franchises of every kind and description, to secure the payment of 250 of its bonds of $1,000 each, payable to the complainant as trustee or bearer.   The bill containing allegations making such action proper, a receiver was duly appointed by the court at the commencement of the suit to take possession of the property involved in it, which has since been and now is in his possession.   To the bill the defendant company interposed no defense, but numerous parties, some unsecured creditors, and some claiming to be legal holders of the bonds thus secured, with leave of the court, intervened in the case.   A reference was subsequently made to the master to take the evidence in respect to the claims of the respective parties, and

to report his findings of fact in the premises, with the names of the holders of the bonds and the respective amounts thereof, together with the character and amount of all claims made against the defendant company. Upon the coming in of the master's report, exceptions were filed by several of the intervenors, all of which were withdrawn at or before the time of the argument on the exceptions, except as to the amount proper to be allowed the attorney of the intervenor Capron, and except as to the exceptions filed by the intervenor Baines. Baines was found by the master to be a general unsecured creditor of the defendant company to the amount of $32,987.81, besides interest, for which he had obtained judgment. That indebtedness was due, as the evidence shows, for work done by the assignor of Baines on the extension of the defendant company's railroad between February and July, 1888. The master also found, among other things, that the bonds and mortgage were executed by the defendant company on the 2d day of April, 1888, to the complainant as trustee; that none of the bonds were ever sold, but that they are all held by various named parties as collateral security for pre-existing indebtedness of the defendant company, and not otherwise; that 10 of said bonds are so held by the First National Bank of San Diego as trustee, 118 by George Sturges, 2 by T. Case, 1 by the San Diego & Coronado Ferry Company, 2 by the San Diego & Coronado Transfer Company, 103 by the Coronado Beach Company, 14 by Spreckles Bros. Commercial Company, and 2 by John G. Capron. The master further found that the giving of the bonds as such collateral security "was in each case the direct means of securing to the defendant company, the San Diego Street-Car Company, an extension of time in the payment of pre-existing indebtedness of said San Diego Street-Car Company."

The allegations of the bill in respect to the insolvency of the defendant company at the time of the commencement of the suit not only stands confessed by it, but the master finds that the property covered by the mortgage constitutes very inadequate security for the indebtedness secured by it. The exceptions filed by the intervenor Baines are, in effect, that the master erred in finding that any of the bonds are held by the parties named, or any of them, as collateral security for debts of the defendant company, and in finding, in effect, that the parties named as the holders thereof are entitled to any priority over this intervenor in the distribution of the assets of the corporation; that the evidence shows that none of the bonds were ever issued or pledged, or ever became outstanding obligations of the defendant corporation; and that the evidence particularly shows this in respect to the 124 bonds held by T. Case, the San Diego & Coronado Ferry Company, the San Diego & Coronado Transfer Company, The Coronado Beach Company, Spreckles Bros. Commerical Company, and John G. Capron.

A preliminary objection is made to the right of the intervenor Baines to be heard in support of the exceptions filed by him, first, upon the ground that the exceptions are insufficient in form, and, next, because the petition in intervention of the intervenor Baines contains no allegations in respect to the invalidity of the pledging of the bonds. It is a

sufficient answer to the latter objection to say that the bill contains no averment in regard to the pledging of the bonds, nor as to who were the owners or holders of them.   The bill alleges the outstanding of more than the number of bonds necessary to bring the case within that provision of the mortgage authorizing the complainant, as trustee, to commence suit to foreclosure the mortgage, upon request in writing made by the owners and holders of 124 of them, and in default of payment of interest thereon for a certain time; but it neither alleges the exact number of bonds issued and outstanding, nor the holders or owners of any of them.   All of this was left to be ascertained by proof before the master under the order of reference.   To hold that the petition in intervention should contain allegations respecting a matter about which the intervenor could know nothing in advance of the making of proof would be altogether unreasonable.   As a general creditor, the intervenor Baines has an equitable lien upon the property of the defendant company, and therefore the right to contest the question of priority of other asserted liens.   *Richardson's Ex'rs* v. *Green*, 133 U. S. 30, 10 Sup. Ct. Rep. 280; Daniel, Ch. Pr. (5th Amer. Ed.) pp. 1173, 1312.   The exceptions, I think, are sufficient in form to entitle the intervenor to be heard.   In respect to the merits, the case shows that on the 7th of February, 1888, the following resolution was unanimously adopted by the stockholders of the defendant corporation present at the meeting, and representing more than two-thirds of the capital stock of the company:

"Whereas, it is necessary, for the purpose of extending and constructing the street railroad of this company in the city and county of San Diego beyond where it is now constructed, and for the purpose of providing means for furnishing the necessary rolling stock and equipments therefor, and to pay for labor done and to be done in the construction, maintenance, and operation of the said road, that the company shall incur a bonded indebtedness, and issue and sell its bonds in the sum of $250,000, to be secured by first mortgage on all of the property and franchises of said company of every kind and description: therefore, be it resolved, for the purposes above set forth, that the board of directors of this company be, and they are hereby, authorized and directed to cause to be prepared and issued the corporate bonds of this company, bearing interest at the rate of six per cent. per annum, payable semi-annually, not to exceed in number 250, for the sum of $1,000 each, having twenty years to run; time, terms, and manner of issuing, disposing of, and method of redemption left to the discretion of said board of directors. And that said board of directors shall cause to be prepared and properly executed, for the purpose of fully securing the payment of said bonds, principal and interest, according to their tenor, a first mortgage on all the property and franchises of said company of every kind and description."

Pursuant to this resolution of the stockholders, the board of directors of the defendant corporation, at a meeting held March 6, 1888, unanimously adopted the following resolutions:

"Resolved, *first*, that the president of this company be, and he is hereby, authorized and directed to cause to be prepared, and to be duly executed under the corporate seal of this company, attested by the signatures of himself and the secretary of this company, two hundred and fifty bonds of this company. Each of said bonds shall be for the principal sum of one thousand dollars, numbered from one to two hundred and fifty, both inclusive, the ag-

gregate amount of all of said bonds being two hundred and fifty thousand dollars. They shall be dated as of April 2, 1888, and be payable, as to principal, twenty years after date. They shall bear interest at the rate of six per centum per annum, payable semi-annually on the second days of October and April each year, coupons for which interest shall be annexed. They shall be made payable at the office of the Farmers' Loan and Trust Company, in the city of New York, in the state of New York.

"Resolved, *second*, that for the purpose of securing to the holders of all of said bonds the payment of both principal and interest, without any priority or preference, the president of this company is authorized and directed to be caused to be prepared, and to be executed under the corporate seal of the company, and duly acknowledged, a mortgage to the Farmers' Loan and Trust Company of the city of New York, as trustee for the holders of said bonds, upon all the property and franchises of the company now owned, or that may be hereafter acquired by it, for the uses and purposes of its railway. Said mortgage shall contain a provision that if any default be made in the payment of any interest, and such default shall continue for sixty days, then the sum secured by said bonds shall, at the option of the holders of such bonds, expressed as hereinafter in a manner to be indicated in said mortgage, become due and presently payable, and shall also contain all such provisions as are usually contained in a railway trust mortgage, and as to the president of the company may seem expedient."

Accordingly, the bonds, with the usual coupons attached, were prepared, and, together with the mortgage, were executed by the defendant corporation to the complainant as trustee, each of the bonds having indorsed upon it a certificate to be executed by the trustee in this form: "The Farmers' Loan and Trust Company of New York, trustee, hereby certifies that this bond is one of a series amounting in the aggregate to two hundred and fifty, as mentioned in the within-described mortgage." At the time of the execution of the bonds and mortgage H. L. Storey was president of the defendant corporation, E. S. Babcock was its vice-president, and they, together with O. S. Hubbell, Milton Santee, and a Mr. Thomas, constituted its board of directors. The defendant corporation was at this time largely indebted, and among its creditors was the First National Bank of San Diego, a banking corporation, whose board of directors was composed in part of E. S. Babcock and H. L. Storey, and the Coronado Beach Company, also a corporation, and of which Babcock was president and Storey vice-president. The debt from the defendant company to the First National Bank was then $40,000, and that to the Coronado Beach Company was large, but concerning the exact amount of which there was then some controversy. Storey, as president of the defendant company, had entered into negotiations with a Mr. Claypool of Indianapolis for the sale of the bonds on commission, and when they were executed they were sent east to be sold, but, owing to some defect of form, they were returned for correction. In May, 1888, Storey went to New York, where Babcock then was. What took place between them there, and what occurred subsequently in California in respect to the disposition of the bonds, is stated by Babcock, whose testimony is more favorable to the holders of the bonds than that of any other witness, substantially as follows: On Storey's arrival in New York in May he told Babcock that the First National Bank of San Diego,

to which, as has been said, the defendant company was indebted in the sum of $40,000, must have the money. Storey and Babcock then went to the Chemical National Bank of New York, which agreed to loan the defendant company the $40,000 with which to pay the First National Bank of San Diego upon its note, provided the note be indorsed by Thomas, Hubbell, Storey, and Babcock, all of whom were at the time directors of the defendant corporation. The note was accordingly executed. When it was indorsed by Babcock, the latter said to Storey that he did not like to personally indorse the note of the defendant company, to which Storey replied that he would see that Babcock should have the bonds to protect him and the other indorsers, and also for the security of the amount due from the defendant company to the Coronado Beach Company, then supposed to be about $75,000. Storey then returned to California, and the bonds were sent on to the Farmers' Loan & Trust Company for certification. They were subsequently, upon a telegraphic order from Storey, delivered by the trustee to Babcock. The latter, pursuant to an understanding with Storey to that effect, made persistent efforts in various cities in the east to sell the bonds, but without success, and in July, 1888, returned to San Diego, to find the defendant company greatly embarrassed by pressing demands for money due, among others, one for $30,000, then held by the First National Bank of San Diego. As collateral security for this latter claim, Babcock, at Storey's suggestion, gave the bank 45 of the bonds. At Storey's request, Babcock also gave four of the bonds to the St. Louis Car Company as security for a debt due that company by the defendant corporation. The balance of the bonds he then took to San Francisco, with Storey's consent, and deposited them with J. D. Spreckles & Bros. as collateral security for a debt of about $70,000, then due them from the Coronado Beach Company; at the time telling Spreckles & Bros. that the bonds had been pledged to the Beach company. That was the latter part of July or the first of August, 1888. On Babcock's return to San Diego he found that some Chicago creditors of the Coronado Beach Company had become so pressing for their money that it was arranged between him and Storey to send Storey's son east with some of the street-car bonds, to pledge as security for that indebtedness; and in pursuance of that arrangement Babcock requested J. D. Spreckles & Bros. to deposit 59 of the bonds he had left with them with the Bank of California in San Francisco, to the credit of the First National Bank of San Diego, and arranged with the latter to turn over some of the bonds held by it to young Storey, to be taken to Chicago for the purpose already stated. This arrangement seems to have been carried out, except that Spreckles & Bros., instead of depositing the 59 bonds with the Bank of California, to the credit of the First National Bank of San Diego, sent them to the latter institution direct. Babcock also got Spreckles & Bros. to deliver 40 of the bonds held by them to W. J. Adams, as collateral security for a debt of $30,000 due him by the Coronado Beach Company, and he subsequently turned over 14 of the bonds to Spreckles & Bros. Commercial Company, as collateral security for a debt of about

$8,000, due that company by the Coronado Beach Company. Fourteen of the bonds taken by young Storey to Chicago were turned over by him as security to creditors of the Beach company there, and the balance of the bonds taken by him (the exact number of which does not appear) he sent to the Central Trust Company of New York, for account of the Coronado Beach Company. The bonds so placed in Chicago were subsequently returned to the Beach company.

Babcock further testified that some time in the summer or fall of 1888 the $40,000 note of the street-car company given the Chemical National Bank of New York became due, and that at the request of at least three of the directors of the defendant company he wrote to that bank, asking an extension of time within which to pay the money, and offering to give as security therefor street-car bonds at 80 cents on the dollar, which proposition was accepted, and the $40,000 note of the defendant company, with the personal indorsements, was taken up by the execution of a new note of the defendant company, to secure which 60 street-car bonds were deposited by Babcock with the First National Bank of San Diego, as trustee. When the second note so given the Chemical National Bank became due, it was again renewed, but on that occasion that bank required that the note of the defendant company be guarantied by the First National Bank of San Diego, and, as security against such guaranty, the latter bank continued to hold, but for itself, the 60 bonds it had theretofore held as trustee for the Chemical Bank. These various dispositions of the bonds of the defendant company were made by Babcock, who was evidently exerting himself to tide over the crisis then existing in the affairs of both the defendant company and the Coronado Beach Company, without any authority of the board of directors of the defendant company. Babcock, however, testified that all of the directors of the latter company knew about the disposition that had been and was being made of the bonds; that it was a matter of general conversation among them when they met on the street; that Storey, the president, had actual notice of all the transactions at the time of their occurrence, and consented to them; that while Thomas and Hubbell, two of the directors, may not have known of each of the transactions at the time of their occurrence, they knew of the deposit of the bonds with Spreckles & Bros., and that it was at their request that he (Babcock) got Spreckles & Bros. to deposit the 59 bonds with the First National Bank of San Diego, of which bank Hubbell and Thomas were also directors. There were still other dispositions subsequently made of some of the bonds, presently to be stated. None of them, however, were ever sold, and not one of them was ever in the possession of the defendant company after they were sent to the complainant for certification. But certain resolutions in respect to them were passed by the board of directors of the defendant corporation, subsequent to the dispositions already detailed, which will now be set out. At a meeting of the directors on the 2d of October, 1888, at which Babcock, Storey, Hubbell, and Santee were present, and from which E. H. Storey, the other director, at that time was absent, the following resolution was unanimously adopted:

"Be it resolved by the board of directors that the president of the company be, and is hereby, authorized to use the bonds of this company, at not less than 66⅔ per cent. of their face value, as collateral security in procuring at least four months' extention of time for the payment of any obligations of the company outstanding."

On the 21st of November, 1888, the board of directors unanimously adopted the following resolution offered by Babcock:

"Resolved by the board of directors of the San Diego Street-Car Company that the president and secretary be, and they are hereby, authorized to make a loan of any sum up to $250,000 from any person or persons, corporation or corporations, of or through whom the same may be negotiated, at nine per cent. interest per annum, payable one year after date, with the privilege of renewal for one year, and with the further privilege of repaying said loan at any time, on the payment of one per cent. per month interest for even months from date of loan until paid. And for that purpose the said officers are hereby fully authorized and empowered to pledge as security for such loan all or any part of the bonds of this company heretofore issued and secured by mortgage to the Farmers' Loan and Trust Company of New York, as trustee. And the said officers are hereby authorized and empowered to give such party or parties making such loan an option for the purchase of such bonds, at the sum of ninety cents on the dollar, which option shall be and remain irrevocable until the repayment of any loan so made."

On the next day, to-wit, November 22, 1888, at a special meeting of the board of directors, it was unanimously resolved—

"That the president of this company be, and hereby is, authorized to give Carter Tebbis, of San Francisco, authority to negotiate a loan of $150,000 on the company's $250,000 of first mortgage bonds, at nine per cent. interest per annum, for one year, with privilege of another year at same rate; said authority to stand good up to and including December 2, 1888. And when loan is made, a commission of two and one-half per cent. be paid said Tebbis, said commission to be deducted from said loan; this company to have the privilege of anticipating the note by paying one per cent. per month for even months for time money is used."

As has been already said, in effect, at the time of the passage of these three resolutions, not one of the bonds in question was in the possession of the defendant company, but all of them were then held by third parties, who claimed to hold them as collateral security for various debts. Babcock, however, testified that when the resolutions of November 21st and 22d were passed it was understood among the holders of the bonds that, if the proposed loan could be effected or the bonds sold, the holders of them would surrender them, and share *pro rata* in the proceeds. But no loan was effected, no sale made, and nothing was done under the resolutions of November 21 and 22, 1888. On the 28th of January, 1889, at a meeting of the directors of the company, at which three of them were present, and from which two were absent, the following resolution offered by Babcock was adopted:

"Resolved, that the president of this company be, and is hereby, authorized and directed to use the bonds of this company as collateral security to any creditors where in his judgment it is wise and expedient so to do, subject to the ratification of the board of directors."

Respecting this resolution, Babcock testified:

"I think that resolution was passed more to put on record the contemplated action of giving bonds to different creditors in town, principally feed, who were threatening attachments on the railroad. And I said to Mr. Santee, [the then president of the defendant company,] when he approached me on the subject: 'Certainly, we would give any amount of bonds it was necessary to quiet those people from attaching the road on their claims.'"

And Santee, being asked: "Did you, as president of the company, since the date of that resolution, use any of the bonds of the street-car company as collateral security under that resolution?" answered: "I have not had any of the bonds in my possession since I was elected president. The bonds were all out at the time." On the same day the last resolution of the board of directors was passed, to-wit, January 28, 1889, the annual meeting of the stockholders of the defendant company was held, at which 2,072½ shares of the 2,500 shares into which the capital stock of the company was divided were represented, and at which 427½ shares were not represented, the following resolution offered by Babcock was unanimously adopted:

"Resolved, by the stockholders of the San Diego Street-Car Company, that all the acts of the board of directors and officers of this company done during the past year be, and in all things are hereby, confirmed, ratified, and approved."

The only stockholder present and voting for this resolution besides the directors of the company, was O. I. Tyler, holding 5 shares. The others voting for it were Babcock, holding for himself 972 shares, and as proxy for J. Collett, 170 shares; Storey, 420½ shares; Santee, 250 shares; Hubbell, 250 shares; and Cook, 5 shares. All of these were not only directors of the defendant company, but Babcock, Storey, Santee, and Hubbell, representing almost the entire number of shares that were voted for the resolution of ratification, were also interested in and directors of the corporations that claimed to hold as collateral security the great bulk, and almost the entire number, of the bonds in question. In addition to the disposition of the bonds already mentioned, Babcock turned over to the San Diego & Coronado Transfer Company two of the bonds, and to the San Diego & Coronado Ferry Company one of them, as collateral security for indebtedness due to them, respectively, from the Coronado Beach Company; and to T. Case, he turned over two, to John G. Capron, two, and to the First National Bank of San Diego, as trustee for the San Diego Lumber Company, the Russ Lumber & Mill Company, the West Coast Lumber Company, and Hunsaker, Britt & Lamme, ten of the bonds as collateral security for indebtedness due those parties from the defendant corporation. The only creditor of the defendant company to whom bonds in a greater or less amount were not distributed seems to have been Graham, whose claim is represented by the intervenor Baines, and which claim is the claim of all others against the defendant corporation that comes most directly—if it is not the only one that does come—within the purview of the resolution authorizing the issuance of the bonds in question, and under which they were in fact executed; for it was to pay the cost of the extension of the defendant company's railroad

that the bonds were authorized and directed to be issued and sold. To permit the bonds so issued to be wholly diverted from the purpose for which they were executed, and, to the entire exclusion of a demand for such work, to be appropriated to the payment, not only of pre-existing indebtedness of the defendant company, but also the indebtedness of one of its creditors, is surely contrary to the first principles of equity. Since the defendant corporation is insolvent, and the mortgage given to secure the payment of the bonds covers its entire property, to sustain the pretensions of the holders of the bonds is to exclude entirely from payment the claim for doing, in part, the very work to pay for which the bonds were authorized and directed to be issued and sold. This, as has been said, is manifestly inequitable.

It is further urged that none of the bonds are, or ever became, valid outstanding obligations of the defendant company. The case shows that not one of them was ever sold. Since they were first delivered to Babcock in New York, not one of them has ever been in the possession of the defendant corporation. It is not pretended that the delivery to him as collateral security was in any way authorized by the board of directors of the defendant company, or that any of the individual directors, except Storey and Babcock, at the time knew of the agreement between them by which all of the bonds are claimed to have been pledged to the latter for himself and others. Yet these bonds, if legally issued, were secured by a mortgage upon all of the property and franchises of the defendant corporation of every kind and description, and, contrary to the purpose expressly declared in the resolution authorizing the issuance of the bonds and the giving of the mortgage to secure their payment, were pledged by these two directors—one its president and the other its vice-president—to secure in part an indebtedness in which they were largely interested, and at a time, too, when the defendant corporation was largely indebted to third parties. Neither the president nor any other officer of a corporation organized under the laws of California has the power thus to mortgage or dispose of all the property of the corporation. It is, among other things, provided by the statute under which the defendant company was organized that "the corporate powers, business, and property of all corporations formed under this title must be exercised, conducted, and controlled" by a board of directors, (section 305, Civil Code Cal.;) and by section 308 of the same Code, among other things, that "every decision of a majority of the directors forming such board, made when duly assembled, is valid as a corporate act." And of its proceedings, the board is required to keep a record which shall be "open to the inspection of any director, member, stockholder, or creditor of the corporation." Section 377, Id.

In Gashwiler v. Willis, 33 Cal. 16, the trustees of a corporation, acting not as a board, but as individuals, undertook to dispose by deed of the corporate property, being expressly authorized to do so by the stockholders at a regular stockholders' meeting; but the court held that such conveyance could only have been authorized by the board of directors when assembled as such; saying: "The corporation could only act—

could only speak—through the medium prescribed by law, and that is its board of directors." See, also, *Alta Silver Min. Co.* v. *Alta Placer Min. Co.*, 78 Cal. 632, 21 Pac. Rep. 373; *Graves* v. *Mining Co.*, 81 Cal. 303, 22 Pac. Rep. 665.

It is contended that if the pledging of the bonds in question was not originally valid, it was made so by the resolution adopted at the stockholders' meeting of January 28, 1889, by which all of the acts of the board of directors and officers of the defendant company during the year then last past was confirmed, ratified, and approved. If the pledging of the bonds in question admitted of ratification, I do not think, in view of the evidence in the case, that the general and sweeping resolution ratifying "all of the acts of the officers" constituted a valid ratification of the acts in question. I think the record fails to show the knowledge of facts that is requisite to the validity of such ratification. Besides, in every case, the application of that doctrine largely depends upon the circumstances of the case. In speaking of the application of the doctrines of ratification and estoppel, it is said in Morawetz on Private Corporations, (section 631a:)

"The application of these doctrines necessarily depends, in each case, upon all the peculiar circumstances. The equity of the case must be determined. It is necessary to consider the character of the act with which it is sought to charge the corporation, the importance of the act, and the degree of publicity which was given to it. The good faith or bad faith of the parties, and their business relations, are also important considerations."

Here, as has been seen, the only stockholder present, and voting for the resolution of ratification, besides the directors of the company, was Tyler, holding 5 shares of a total number of 2,500 shares. All of the others voting for it were not only directors, voting to ratify in general terms their own acts, not in any way named, but acts which, if ratified, must result to their own individual interest, and to the prejudice of some of their *cestuis que trustent*. Under such circumstances the case is not one for the application of the doctrine of ratification, even if it be conceded that the acts in question admitted of ratification.

Aside from the want of legal power already referred to, a court of equity will not permit the directors of a corporation, who are not only trustees for the stockholders of the corporation, but for its creditors as well, to thus dispose of the corporate property to themselves, or for their individual benefit. However in fact intended, equity treats such transfer as fraudulent, because it operates as a fraud upon the *cestuis que trustent*. *Koehler* v. *Black River, etc., Co.*, 2 Black, 715. See, also, upon the general subject, *Richardson's Ex'r* v. *Green*, 133 U. S. 30, 10 Sup. Ct. Rep. 280. In California, it is provided by statute that "neither a trustee, nor any of his agents, may take part in any transaction concerning the trust in which he, or any one for whom he acts as agent, has an interest, present or contingent, adverse to that of his beneficiary;" with certain enumerated exceptions not applicable to the present case. Civil Code, § 2230. And section 2234 of the same Code declares that every violation of the provisions, among others, of section 2230, "is a fraud against the

beneficiary of the trust." These Code provisions have been held applicable to the directors of corporations in their trust relations by the supreme court of the state. *Graves* v. *Mining Co. supra.*

But apart from and beyond the foregoing considerations, the constitution of California in terms declares that "no corporation shall issue stock or bonds except for money paid, labor done, or property actually received. * * *" Section 11, art. 12. A similar provision is embodied in the statutes of the state. Civil Code, § 359. This constitutional and statutory inhibition is plain, and has but one meaning,—the money paid, labor done, or property actually received must be paid, performed, or received, as the case may be, on account of the issuance of the bonds; and any bonds issued contrary to this provision are of course illegally issued. The provision does not mean, and cannot be held to mean, that such bonds may be issued as collateral security for any sort of pre-existing indebtedness. Now none of the bonds in question are, or ever were, issued or held for money paid, labor performed, or property actually received on account of their issuance. On the contrary, all of them were delivered and are held as collateral security in part for pre-existing indebtedness of the defendant corporation, and, in large part, for pre-existing indebtedness, not of the defendant corporation, but of one of its creditors. As has already been said, not one of the bonds was ever sold, and not one of the holders of them paid a dollar on account of their delivery. In no just or legal sense, I think, can any of them be regarded as an innocent purchaser for value. The bonds were distributed and redistributed, not only without authority of the board of directors of the defendant corporation, but in utter disregard of the constitutional and statutory provisions upon the subject, and contrary to the very purpose declared in the resolution authorizing their issue.

My conclusion is that the exceptions of the intervenor Baines should be, and therefore are, sustained; and as, in my judgment, none of the bonds in question ever were legally issued, or ever became valid outstanding obligations of the defendant corporation, it results that the bill was not well filed.