## STEVENSON v. MARBLE.

### (Circuit Court, S. D. California. October 5, 1897.)

### No. 694.

1. SALES—FRAUDULENT REPRESENTATIONS—RESCISSION.

Where a seller of stock and bonds of a corporation falsely and fraudulently represents that the mortgage securing the bonds is a first and only mortgage, he cannot defeat the buyer's suit to rescind the contract by showing that after the suit was brought he paid off, and procured the cancellation of, the prior incumbrances.

2. SAME.

Nor, in such a case, does it deprive the buyer of his right to rescind, that the contract bound the seller to pay off all liabilities of the corporation, except the mortgage debt in question, if it is shown that the buyer did rely upon the representation that there was no prior mortgage.

Gardiner, Harris & Rodman, for complainant.
Wells, Works & Lee and Works & Lee, for defendant.

WELLBORN, District Judge. This is a suit, brought April 29, 1896, and now on final hearing, to rescind a contract for fraud in its procurement. The real issues in the case, as I view them, are mainly questions of fact, and therefore my opinion will be devoted largely to a review of the evidence. The contract is as follows:

"Los Angeles, November 29th, 1895.

"This agreement, made this 29th day of November, 1895, between John M. C. Marble, hereafter called the 'seller,' and John B. Stephenson, Jr., hereafter called the 'buyer,' witnesseth: That the seller hereby sells the buyer 255 shares of the capital stock of the Van Wert Electric Light and Power Company, of Van Wert, Ohio, amounting to $25,500, or 51% of the total issue thereof, and $25,000 of bonds secured by the first and only mortgage, of $50,000, covering said electric light company plant and franchises, for the price or sum of fifteen thousand dollars, payable as follows, viz.: One thousand dollars cash before July 5/96; four thousand dollars, with interest at 5%, to the order of John M. C. Marble; buyer's note, payable on or before July 5/96, for $10,000, with interest at 5%, to the order of John M. C. Marble, and secured by certificate of the Missouri Coal & Construction Company for $10,000, with buyer's right to collect interest due on said certificate January 2/96. Seller agrees to pay forthwith all taxes due on said plant, and all proportions of taxes hereafter paid by said company, so far as they relate to any charge upon said plant anterior to Dec. 1/95, and any and all liabilities of every kind owing by said company at the closing of the thirtieth day of November, 1895, excepting the mortgage debt of $50,000 (capital stock not considered a liability, in this sense) above referred to. It is understood between seller and buyer that all cash in bank, and all bills for lighting falling due at the closing of the thirtieth day of November, A. D. 1895, shall become the personal property of the seller. It is understood between seller and buyer that the company shall

faithfully carry out its contract to reimburse consumers for moneys advanced on account of meters. Signed in duplicate. In witness whereof, we hereunto affix our hands and seals this 29th day of November, 1895.

"Witness signing: John M. Lutz.

"John M. C. Marble.          [Seal.]
"John B. Stevenson, Jr.    [Seal.]"

Complainant made the cash payment and executed the two notes provided for in said contract, and the stock and bonds were duly delivered to him. Prior to the making of the contract, defendant, through one John M. Lutz, as hereinafter stated, furnished complainant with the following papers:

"The National Bank of California, at
"Los Angeles, Cala., August 5th, 1895.

"The Electric Light & Power Company of Van Wert, Ohio, has a bonded indebtedness of $50,000, 6% bonds, and a capital of $50,000. The Van Wert Gaslight Company has a capital of $37,500. These two companies have for years been on unfriendly terms, and have furnished light below its value, and yet earned considerable net money,—the former, more than the interest on its bonds; and the latter, by the latest data before us (1892), earning $2,524.64, net. Since then its net earnings have moderately increased. Recently an option has been taken on the gas plant, looking to combining the two companies under one management. This, of course, removes unreasonable competition, and will enable an advance of rates to that customary in other localities, which will increase the income fully 25% to 33%, without adding to expense, making the increase entirely net income. In addition to this, a union of products will very materially reduce the expenses, which will be a further addition to profits. The electric company has a contract with the city for street lighting that is new, bringing in $500 per month, and it will be increased. This is equal to $6,000 per year,—sufficient to pay 6% on a mortgage of $100,000 on the joint properties. In addition to street lighting, the city and county authorities take considerable light, that, if desired, could be set aside as a sinking fund to retire the bonds. The acquiring of the two properties, retiring all their bonds, debts, stock, making an entire and clean new company, would require $84,000, which would represent the cost of the following security, free from all other claims or debt: We would propose that the combined company have a capital of $100,000, and a bonded debt of $100,000, and to assign and set aside irrevocably, to protect the interest, the $6,000 revenue per annum from the city of Van Wert, which contract has eight years yet to run. Both works are in excellent condition, and doing excellent service; and the stock will be a good dividend payor from the start. It would be a pleasure to sell you the mortgages, or to have you join in the deal on joint account, in which case we will agree to carry the principal part of the deal until you can sell the bonds, if so desired, and would ask that you immediately visit Van Wert, and make personal investigation. It is a progressive city, of over 6,000 inhabitants; and the deal, as outlined, means that the new pool gets all the bonds and the stock of the new company for $84,000.

"[Pencil indorsement:] Haven't you among your customers some promoter who would go out and look at this property, and, if he liked it, take the deal?
"Marble.

"[On slip of paper pinned to original paper:] Issue at par 100,000 5% mtg. bonds, with sinking fund of 1% per annum, 33% stock, as bonus to subscribers to bonds."

"The National Bank of California, at
"Los Angeles, Cala., Sept. 7, 1895.

"Mr. H. M. Lutz, c/o Centennial Nat'l Bank, Philadelphia, Pa.—My Dear Mr. Lutz: I wrote you hurriedly yesterday, and sent you a copy of trust deed of Van Wert Electric Light & Power Company. You will notice that the contract of the city street lighting is specially pledged to protect interest. The income from that contract is more than double the interest charge, and the contract

has eight years yet to run. I would not care to sell the present issue of bonds until we know whether a combination of the lighting plants at Van Wert is to be made, unless with the understanding that I could redeem them in cash, should the buyers not care to substitute them for another issue of the combined properties. The electrician in charge of the works is a capable young man,—a graduate of the electrical and mechanics department of the University of Michigan. My son John, who was with me in the bank here, went forward in August to take charge of the business part of the company; and, though August is a dull month, he arranged for new business in that month that will exceed $700 per annum, and will commence coming in in October. Conditions are favorable for September. The largest church in the town, the Methodist, has just voted to put the light in, with but one dissenting vote. I desire my son to return here as soon as possible, but he will remain in charge at Van Wert as long as necessary. For sale of the present issue of bonds at par, I would pay usual commissions, if sold subject to the conditions above referred to. The interest until January 1st next is arranged, so that it would want to be deducted. Any one who will go to Van Wert and inspect things would be likely to take them.

"Very truly,           John M. C. Marble."

These papers were first shown to the complainant, in Philadelphia. Pa., in September, 1895, by H. M. Lutz, who, at the instance of defendant, was seeking a purchaser for said properties. Defendant afterwards, and before the contract was signed, in personal interviews with complainant at Los Angeles, reiterated and confirmed the representations contained in said papers. For the purpose of investigating said properties, complainant made two visits to the city of Van Wert, Ohio,—one on the 7th of October, 1895, and the other on the 7th of November in the same year. After this second visit he proceeded to the city of Los Angeles, Cal., where the contract sought to be rescinded was finally made. Besides the $50,000 mortgage referred to in the contract as the first and only mortgage, there was on record at Van Wert, Ohio, at the date of the contract, another, prior mortgage, covering the plant and franchises of the electric company, and securing bonds of said company to the amount of $35,000. Of these last-mentioned bonds, $20,000 were then held by the Van Wert National Bank as collateral for a note of $10,000 executed to said bank by G. L. Marble, A. V. Rice, and the defendant, and $7,500 were held by the Bass Foundry & Machine Works, of Ft. Wayne, Ind., or its assignee, the Citizens' Bank of Huntington, Ind.. as collateral for a note of the electric company for $4,421.59, on which note the defendant and G. L. Marble were securities. These bonds were not taken up by the defendant, nor was the mortgage canceled, until some time in July, 1896. There were also, at the date of the contract, floating debts against the company, aggregating, approximately, $2,000, which the defendant paid off soon thereafter. Other material facts are in dispute. My findings as to such disputed facts are indicated in the subsequent parts of this opinion.

Complainant submits, as his ground or grounds for relief, that, to induce him to enter into said contract, defendant made certain representations, upon which he (complainant) relied, which were false and fraudulent, and that these representations were as follows: First, that the net earnings of the electric light and power company for years prior to the contract were more than the interest on its

bonds; second, that the stockholders of said electric light and power company were not personally liable for its debts; third, that the net income of the Van Wert Gaslight Company in 1892 was $2,524.64, and that there had since been a moderate increase in its net earnings; fourth, that there were no outstanding bonds of said electric company, other than those secured by the $50,000 mortgage, and that said mortgage was the first and only mortgage. These alleged misrepresentations will be considered in the order of their statement:

1. In their briefs, the parties have confused the representations which were made as to the earnings of the electric company with those that were made as to the earnings of the gas company. For instance, defendant, in his brief, at page 3, states the representation to have been "that, by the latest data before us (1892), the electric company is earning $2,524.64, net, and since then its net earnings have moderately increased." To the same effect, see page 1 of complainant's brief, filed March 6, 1897. By reference to the written paper, called by some of the witnesses a "prospectus," which was exhibited to complainant, it will be seen that the representations as to net earnings in 1892 of $2,524.64 refer to the gas company, and not the electric company. The representations which were made as to the electric company were that its net earnings were more than the interest on its bonds, and that these bonds aggregated $50,000, and bore interest at 6 per cent. per annum. There were also oral representations to the effect that the income of said company would pay all operating expenses, and the interest on its bonds. These oral statements, however, are substantially the same as those contained in the prospectus above mentioned. There is no question but that the representations as to the earnings of the electric company, as I have stated them, were made. The issue between the parties on this branch of the case is as to their truth or falsity. Complainant, I think, has not only failed to establish the falsity of these representations, but the proofs show, or tend to show, that the earnings were as represented. The main argument of complainant in this connection is that, if the earnings of the company had been as large as represented, there would have been no occasion for defendant to have made to said company the advances of money which he did make. This argument is inconclusive; its infirmity lying in the fact that the advances made by the defendant, with two or three exceptions, were applied, not to operating expenses, but to extensions or betterments of the plant. Two reports of the company's business (one for the month of September, and the other for the month of October, 1895) are in evidence; and these reports show that the net earnings of the company for the former month were $457.59, and for the latter $426.64. These amounts are largely in excess of what the earnings were represented to be. It is true that in the month of March, 1896, the income was considerably below the represented monthly earnings. The small receipts for that month, however, are sufficiently accounted for by an injudicious raising of rates made by the then president of the company, John B. Stevenson, 3d, which is testified to by several witnesses,—chiefly, George Hayler, Jr. The testimony

of this witness, who for more than two years was superintendent or manager of the company, and thoroughly acquainted with its operations, including receipts and expenditures, together with the statements taken by him and other witnesses from the books of the company, satisfies me that the representations made by the defendant as to the earning capacity of the electric plant were well founded.

2. There is a sharp conflict of testimony in regard to the alleged representation that the stockholders in said company were exempt from personal liability for its debts. The evidence, however, convinces me that the representations on this subject were confined to the liability of stockholders under the $50,000 mortgage. That mortgage provides:

"Article VII. That it is expressly agreed by and between the said trustee and the said electric company, and is expressly agreed and assented to by each of the holders of said bonds, and of any and all of them (and each such holder, by the acceptance and holding of such bonds, or any of them, does thereby expressly agree and assent to this article), that all liability of stockholders of said electric company, in respect of said bonds, and each of them, whether statutory or otherwise, whether partial, ratable, joint, or several, is hereby expressly waived and released; but nothing in this article shall be deemed to affect or in any wise limit the liability of the corporation, said electric company, itself."

This article itself is a declaration that under the general laws of Ohio there is a liability on stockholders for the debts of the company; otherwise, how could liability be "waived and released"? It must be borne in mind that, according to complainant's testimony, the terms and provisions of this mortgage were fully known to him. The same is true of the defendant. Under these circumstances, it is improbable that the defendant would have represented, or that the complainant would have confided in any representation to the effect, that stockholders generally were exempt from liability for the debts of the corporation.

3. Complainant has failed, in my opinion, to show that the net earnings of the Van Wert Gaslight Company were not $2,524.64 in the year 1892; or that they did not thereafter moderately increase. There is another reason, however, why complainant is not entitled to relief on account of these last-mentioned representations, namely, that they were made by the defendant, not upon his own knowledge, but from data furnished by the gaslight company, which he believed to be reliable, and which were equally accessible to the complainant.

4. As to what representations were made by the defendant in reference to the $35,000 mortgage, the evidence is again conflicting. There is no doubt but that complainant knew that said mortgage had been authorized. This he admits, but testifies positively that defendant represented to him that none of the bonds secured by that mortgage had been issued, and that all of them were then in his possession. Defendant denies that he made any such representation, but, as he states himself, his recollection of what he did represent is not definite. On this issue the evidence strongly preponderates in favor of complainant. The testimony of defendant, so far as material here, is as follows:

"Q. Did you make any statement to him at that time to the effect that the $35,000 bonds had never been issued, and were not outstanding? A. I have no recollection of any such statement. Q. Would you likely have remembered it, if you had made it? A. I think so. I think so. Q. Did you make any statement to him at that time that all of the bonds were still in your possession, and never had been issued? A. No, sir; never made any such statement. Q. Was there any conversation between you and Mr. Stevenson with reference to the outstanding debts of the company, or what they amounted to, or to whom they were due? A. Very little, I think. Q. Was there any? Did you give him a statement as to what the debts were, or did he ask you? A. I don't think that he asked me, though I cannot speak positive as to that. I know that I agreed to pay everything except the $50,000 mortgage. Q. You may state whether at any time when he was here, or at any other time, you represented to him that none of the $35,000 issue of bonds had been issued, and that they were all in your possession. A. If I had represented anything, I would have stated that they were under our control. I have no recollection as to representing anything about them. He had been at Van Wert. Q. Did you and he enter into any discussion of that matter at all,—as to the condition of the securities? A. It is barely possible. Q. Have you any present recollection as to it? A. Not definite enough— ·"

Here the witness' attention was called to another subject.

Thus it will be seen that while there is, in one place, an express denial by the defendant of his having stated that all of the bonds secured by the $35,000 mortgage were in his possession, and never had been issued, yet his testimony, as a whole, shows hesitancy and doubt as to what he did represent on the subject. Particularly is this true of the following answer, which is also significant in other respects:

"If I had represented anything, I would have stated that they were under our control. I have no recollection as to representing anything about them. He had been at Van Wert."

If the defendant had made the representation here indicated,—that the bonds were under his control,—it would have been substantially what complainant asserts was represented, namely, that none of the bonds were outstanding, because bonds held by other parties, either in absolute ownership, or as collaterals, could not, in any just sense, be said to be under defendant's control. Furthermore, it will be observed that the defendant nowhere claims that he informed complainant of the true condition of the bonds covered by the $35,000 mortgage, namely, that $20,000 of them were held by the Van Wert National Bank, and $7,500 of them by the Bass Foundry & Machine Works. On the contrary, he says that he has no recollection of having made, in his interviews with complainant, any representations about them. Now, if complainant was not informed verbally of the real facts concerning the bonds last mentioned, then the statement made impliedly in the prospectus, and expressly in the contract, that the $50,000 mortgage was the first and only mortgage, was the only representation on the subject. That representation, being false, could have been overcome only by proof of oral explanations of the facts as they really existed, yet defendant testifies that he has no definite recollection of any such explanations; and therefore, on his own testimony, this branch of the case is clearly against him.

Leaving out of view, however, the vulnerable points of defendant's testimony, and allowing his denial equal weight with complain-

ant's affirmation, still there are other evidences in the case which turn the scales in favor of complainant, and these evidences are documentary proofs of the most unmistakable character. The prospectus, to which I have already referred, states the bonded indebtedness to be $50,000. The language of the contract itself is still stronger, and more explicit. It, in terms, declares the $50,-000 mortgage to be the first and only mortgage. Both parties, it must be remembered, were familiar with this contract. It was signed in duplicate; the original draft having been prepared by the complainant, and the other copied by the defendant, who, besides, testifies that he read the contract, "and thought it embodied the most pertinent things." Now, since it was expressly represented in the contract that the $50,000 mortgage was the first and only mortgage, and since complainant knew that the $35,000 mortgage had been authorized, it necessarily follows that he was informed either that the bonds secured by the $35,000 mortgage had not been issued, or, if issued, that they had been paid off, and the mortgage lien thus discharged. There is no proof of any representation to the effect that said bonds had been issued, and subsequently paid off. Therefore the representation must have been that said bonds and mortgage, though authorized, were never in fact used. Besides, some of the evidence on which the defendant himself relies supports this conclusion. G. L. Marble testifies, among other things, that he told the complainant that the bond issues were entirely under his control. This language accords with complainant's testimony as to what defendant represented; namely, that the bonds had never been used, and were in his possession. In no other way could they have been entirely under defendant's control. If the bonds were held by other parties, either as purchasers or pledgees, it is obvious that they were not entirely, or at all, under the control of the defendant; and that they were not, at the date of the contract, so controlled, is shown by the undisputed fact that, although defendant immediately thereafter began his efforts to secure their surrender to him, it was seven months and a half before he succeeded in obtaining possession of them, so as to enable him to cancel the mortgage. Mr. G. L. Marble, referring to a conversation between himself and the complainant at Van Wert just before complainant made the contract with defendant, further testifies thus:

"I remember distinctly that the question of the mortgages came up, and I said to him that if he purchased the electric light plant, and desired to float bonds on it, he could either use the thirty-five thousand dollar mortgage or the fifty thousand dollar mortgage; either one or the other could be canceled or used at his pleasure."

Here, again, complainant was impliedly told that, of the bonds covered by the $35,000 mortgage, none were outstanding; otherwise, how could they have been canceled at his pleasure? Again, after complainant had consummated the trade with defendant, and returned to Van Wert, Mr. G. L. Marble testifies that:

"He told me their trade had been made, and he showed me the contract of his purchase of the twenty-five thousand of the fifty thousand bonds, and two

hundred and fifty-five shares of stock, and I told him then that I would at once prepare a release for the thirty-five thousand dollar mortgage, and send it to father for execution," etc.

Is not this manifestly in line with the previous representation that said mortgage was ready for cancellation? To the same effect was the correspondence between the complainant and G. L. Marble in reference to the formal release of the $35,000 mortgage. The material parts of this correspondence are as follows:

"Van Wert, Ohio, Dec. 11, 1895.

"John B. Stevenson, Jr., Esq., Philadelphia, Penna.—Dear Sir: I inclose satisfaction piece (copy) that I have sent father for execution. Under our laws, the simplest release on the margin of the record is sufficient, but my experience with corporate mortgages has been that investors were better satisfied to have such matters in full formality. Should your counsel suggest any changes, I will gladly make them. * * *

"Truly,                                                      G. L. Marble."

"Forest Building, 119 S. 4th St.

"Philadelphia, Dec. 14th, 1895.

"G. L. Marble, Esq., Van Wert, O.—My Dear Sir: Referring to your letter 11th inst., would say that anything relating to any indebtedness excepting the mortgage securing the $50,000 bonds against the Electric Light and Power Co., your father was to pay off. With due appreciation, I would rather not assume any responsibility. Your suggestions, however, appear to be proper and necessary. * * *

"Very resp., etc.,                                          John B. Stevenson, Jr."

Mr. Marble's letter, which was written just 12 days after the date of the contract now sought to be rescinded, unquestionably and clearly implies that the mortgage referred to was then ready for cancellation, which situation could have existed only on the theory that none of the bonds were outstanding. Nor is there in Mr. Stevenson's response anything to the contrary. But it is insisted by defendant that said bonds (that is, those covered by the $35,000 mortgage) were issued by the electric company as collaterals for pre-existing debts of said company, and that this was not such an issuance of the bonds as rendered the company liable on them. In support of this contention, defendant cites the case of Farmers' Loan & Trust Co. v. San Diego Street-Car Co., 45 Fed. 518. That case, however, has no application to the case at bar, as the facts in the two cases are entirely dissimilar. Here the bonds were not issued, without authority, as collaterals for pre-existing debts of the electric company, but the manner of their issuance was as follows: The electric plant was first established in Van Wert in December, 1889. The company, which then owned and operated the plant, was wound up in 1892, and its property disposed of at judicial sale. The real purchaser of the property was G. L. Marble; the funds being furnished by his father, J. M. C. Marble, and the purchase being made in the name of A. V. Rice. Soon thereafter, A. V. Rice, in whose name the property then stood, conveyed the same to the new electric company; the consideration of such conveyance being the capital stock of the company, amounting to $50,000, and $35,000 of the bonds of the company,—these bonds being the $35,-000 issue of January 2, 1893, to which the pending controversy re-

lates. The bonds afterwards passed into the hands of the defendant, J. M. C. Marble, to reimburse or secure him for the moneys which he had furnished in connection with the enterprise. The history of this transaction, in part, as appears from the testimony of John E. Marble, was entered upon the ledger of the new electric company as follows:

1

September, 1892.

Sept. 1. Plant, Dr.                                    ,         85,000 00

The plant of the Citizens' Electric Light and Power was purchased at judicial sale, May 3rd, 1892, by Americus V. Rice, in the interest of this company, then proposed to be formed; said plant being located at Van Wert, Ohio.

On this day, this, the electric light and power company, having heretofore been duly incorporated, said Americus V. Rice conveys the said plant to this company at the agreed valuation of $85,000, further agreeing to make improvements thereon to cost not exceeding $6,375.56; to assign the moneys in bank, from earnings, amounting to $74.84; and to assign the unpaid revenue accounts accruing from operation. Said company to assume the current liabilities. Said Rice to take in payment $35,000 first mortgage 10-30 gold bonds, 6% semiannual, to bear date January 2nd, 1893 (but running from January 1st), and $50,000 in stock, or its proceeds; he to take absolutely $4,700 of said stock, and the proceeds of the residue. Until the issue of said bonds, said Rice is credited with the amount thereof.

A. V. Rice, Cr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35,000 00
Capital stock, Cr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50,000 00
Van Wert National Bank, with whom the account of this company is kept, Dr. . . . . . . . . . . . . . . . . . . . . 74 84
To moneys on hand from operation of plant by A. V. Rice, revenue, Cr. . . . . . . . . . . . . . . . . . . . . . . . .        74 84

The testimony of G. L. Marble explains the original issuance of these bonds more fully, but to the same effect. For instance, the following appears in his testimony:

"Q. Who was the purchaser at the judicial sale? A. Myself. Q. What price was paid for it? A. I don't remember. I think it was $19,500. I want to say that the purchase was made in the name of A. V. Rice."

Again, in answer to the question, "State whether that thirty-five thousand bond issue was ever sold regularly to any person," he answers:

"No, sir; except in the way I have stated. In the reorganization of the plant, the bond issue and the stock issue was, as stated on the journal, to be taken by A. V. Rice, and the plant furnished complete for it,—that is, that the improvements that were then contemplated were to be completed; General Rice's connection with it being simply the channel of issuing the securities for that purpose."

After the bonds were thus regularly issued, they were, by the defendant, or with his consent, pledged, $20,000 to the Van Wert National Bank, and $7,500 to the Bass Foundry & Machine Works. So that the bonds in the case at bar are not open to any of the objections that were urged against the bonds in the case of Farmers' Loan & Trust Co. v. San Diego Street-Car Co., supra. There are yet other

reasons why that case does not apply here, but, in view of what I have just said, it is unnecessary to enumerate them.

But defendant further contends that if it be conceded that the alleged representations as to the bonds were made, and were false, still complainant is not entitled to equitable relief, because no injury resulted from such representations. This contention, to my mind, is not well taken. At the date of the contract, and at the time when complainant gave notice of its rescission, April 14, 1896, and also at the commencement of this suit, April 29, 1896, the evidence indisputably establishes that, of the $35,000 bond issue, there were outstanding $27,500. Surely no argument is necessary to show that this bonded indebtedness, and the mortgage securing it, impaired the value of the stock of the electric company, and also of the bonds secured by the $50,000 mortgage. Neither said stock nor bonds could possibly have been worth at the time of the contract, or at the commencement of this suit, what they would have been worth if the $35,000 mortgage had not been a lien upon the property. This is well illustrated by the action of the Van Wert National Bank in postponing a substitution of the new for the old bonds until all of the latter were surrendered. Mr. Brumbach testifies that he told Mr. Stevenson that the $20,000 bonds of the first issue were ready to be delivered for cancellation as soon as the other $15,000 were taken up. Why was it that the bank required the whole of the old issue to be taken up before accepting the new? Obviously, because $25,000 in the bonds of the new issue would not be as valuable as even $20,000 of the old issue, so long as any considerable part of the latter were outstanding. Defendant's counsel suggest, in this connection, that complainant held the promise of defendant to pay off and discharge the $35,000 mortgage, and that there is no evidence that defendant was insolvent, or unable to do so. These circumstances do not remove from the case the element of injury to which I have adverted; for common experience instructs us that a lien upon property will prejudicially affect its value, whatever may be the ability of the debtor, outside of the incumbered property, to meet the obligation which the lien secures. Persons who contemplate purchasing will not readily accept titles thus incumbered or clouded. It is true that in July, 1896, the bonds were surrendered and the mortgage canceled; but complainant's right to a rescission of the contract must be determined by the facts, concerning the bonds, as they existed at the time of the contract, or not later than the commencement of the suit, and cannot be affected by what may have subsequently transpired. I repeat that when the suit was brought the lien for $27,500 on the property of the electric company must necessarily have impaired the value of the bonds of said company, secured by a subordinate lien, as well as the value of the stock of the company, and that complainant's right, accruing in part therefrom, to rescind the contract, could not be defeated by a discharge of the prior lien after suit was brought. Thomas v. Coultas, 76 Ill. 493; Merritt v. Robinson, 35 Ark. 483. From the syllabus in Thomas v. Coultas, supra, I extract the following:

"Where a party filed a bill to rescind a contract for the exchange of lands on the ground of fraud in concealing the fact of there being judgments which were liens on defendant's lands at the time, the discharge of such liens, after bill filed, will not affect the complainant's rights in the least. The filing of the bill in such a case is a rescission, and an election to recover back the property given in exchange, and the complainant, after that, could not revive the contract without the defendant's assent."

In Merritt v. Robinson, supra, the second and third paragraphs of the syllabus, omitting headlines, are as follows:

"(2) * * * If a vendor sells goods which he knows to be mortgaged, without giving information thereof to the purchaser, the sale would be fraudulent. The suppression of the truth is equivalent to a falsehood, when the vendor is under obligation to disclose the truth. (3) * * * Fraud avoids a contract ab initio, and the party committing it can take no advantage of it, nor acquire any rights or interest by means of it. If, therefore, the vendor of mortgaged goods, knowing of the mortgage, conceal it from the vendee, the vendee may, on discovering the fraud, treat the contract as void, and rescind it, by returning, or offering to return, the property, and demanding that given in exchange for it; and the vendor cannot defeat his right to rescind by afterwards procuring a release of the property from the mortgage."

Defendant further insists that complainant did not rely upon the representations as to the bonds, but upon defendant's promise to pay off the debts of the company. With this I cannot agree. It is not necessary to the rescission of a contract, for fraudulent representations, that the complaining party should have relied solely upon such representations, but it is sufficient if they constituted one of the material inducements to his action. 2 Bigelow, Frauds, 497, 554; James v. Hodsden, 47 Vt. 127; Safford v. Grout, 120 Mass. 20; Fishback v. Miller, 15 Nev. 428. While defendant's promise to pay off the debts of the electric company was broad enough to include the bonds secured by the $35,000 mortgage, I am satisfied from the evidence that the main object of this promise was to provide for floating debts, and that, as to the bonded liabilities of the company, complainant relied largely, if not altogether, upon the representation that the $50,000 mortgage was the first and only mortgage. This must be so, since the representation and promise were parts of the same instrument. Besides, complainant testifies positively that the representations as to the bonded indebtedness of the company and its earning capacity did influence him in his purchase, and other facts of the case confirm his testimony on this point. That he believed there were no outstanding bonds other than those secured by the $50,000 mortgage, and that such belief was a material consideration with him, are shown clearly by the circumstances that when he drew the contract, which, as already stated, was prepared and written out by him, he inserted therein a clause expressly declaring the $50,000 mortgage to be the first and only mortgage. It is incredible that he would have consummated the trade, had he known that $27,-500 of the $35,000 bond issue were liabilities against the company. The price to be paid by him for a little more than one-half of the stock of said company, and one-half of the $50,000 bond issue, was $15,000; that is to say, he was buying, approximately, one-half of said stock and bonds on a valuation of $30,000 for the whole. Is it reasonable to suppose that he would have consummated a trade of

this sort had he known that there was a prior mortgage indebtedness on the plant of the company almost equal to its full estimated value? I think not. After careful consideration of all the evidence, I am satisfied that it was represented to the complainant at the time of the contract that the $50,000 mortgage was the first and only mortgage on the property of the electric company, whereas, in truth and in fact, there were then outstanding, of which the complainant was not informed, $27,500 of the bonds covered by the prior $35,000 mortgage. On this ground, complainant is entitled to a rescission of the contract, and a decree to that effect will be entered.