[Civil No. 2313.   Filed April 20, 1925.]

[235 Pac. 401.]

## DRAGOON MARBLE & MINING COMPANY, a Corporation, Plaintiff-Appellant, v. J. S. McNEISH, Defendant-Appellee.

1. APPEAL AND ERROR—APPELLATE COURT WILL NOT DISTURB TRIAL COURT'S FINDINGS IN EQUITY OR LAW, WHEN SUPPORTED BY EVIDENCE.—Appellate court will not disturb trial court's findings either in equity or at law, when supported by evidence.

2. JUDGMENT—NOT SUBJECT TO ATTACK IN INDEPENDENT PROCEEDING BECAUSE SECURED BY PERJURED TESTIMONY.—Judgment in corporation officer's action against corporation for moneys advanced and services rendered could not be attacked in an independent action to set aside such judgment on ground that it was secured by perjured testimony.

2. Equitable relief against judgments procured by perjured testimony, see notes in 3 Ann. Cas. 83; 10 Ann. Cas. 1107. See, also, 15 R. C. L. 858.

3. JUDGMENT—MAY BE ATTACKED IN INDEPENDENT PROCEEDING, WHERE ONE PARTY BY FRAUD PREVENTS OTHER FROM HAVING FAIR HEARING.—Judgment may be attacked in independent proceeding, where one party by fraud or imposition extrinsic to issues on trial prevents other from having fair hearing.

4. CORPORATIONS—SALE UNDER EXECUTION TO OFFICER HELD INVALID. Where director and secretary of corporation purchased all property of corporation at sale under execution on judgment in his favor for far less than property's actual value, and attempted to prevent corporation from raising funds necessary to pay his judgment, the sale was invalid.

5. CORPORATIONS—OFFICER MUST NOT PREVENT CORPORATION FROM RAISING FUNDS TO PAY HIS JUDGMENT.—Director and secretary of corporation, who secured judgment against corporation for moneys and services rendered, was charged with at least negative duty to put nothing in way of corporation's effort to raise funds to pay his judgment.

6. EXECUTION—CORPORATION'S SUIT TO SET ASIDE SALE WOULD LIE, THOUGH INSTITUTED BEFORE REDEMPTION PERIOD HAD EXPIRED.—Corporation's suit to set aside execution sale to officer of corporation would lie, though suit was instituted before redemption period had expired, and before sheriff gave his deed to purchaser, where under facts interposition of equity court was warranted.

---

See (1) 4 C. J., pp. 877, 898. (2) 34 C. J., p. 475. (3) 34 C. J., p. 470. (4) 14a C. J., p. 113. (5) 14a C. J., p. 113.

APPEAL from a judgment of the Superior Court of the County of Cochise. A. M. Sames, Judge. Judgment reversed.

Mr. O. Gibson and Mr. J. T. Kingsbury, for Appellant.

Messrs. Doan & Stephenson, for Appellee.

JONES, Superior Judge.—This is an appeal from a judgment for the defendant in an action brought

---

3. See 15 R. C. L. 762. 5. See 7 R. C. L. 484.

by the Dragoon Marble & Mining Company, a corporation, against J. S. McNeish (No. 5029) to set aside a judgment in an action theretofore brought by McNeish against the company in the same court for moneys advanced and services rendered.

It appeared from the evidence that the appellant company was organized under the laws of Arizona in 1917, with an authorized capital stock of 1,000,000 shares of the par value of $1 each for the purpose of taking over and developing a group of unpatented claims constituting a marble quarry in the Dragoon mountains of Cochise county, Arizona. One A. T. Kolb and appellee, J. S. McNeish owned the marble quarry mentioned in different interests, and were the chief promoters of the corporation. At the organization meeting the former was elected director and president, and the latter director and secretary, and they continued such thereafter. Of the remaining three directors, two resided in California, and the fifth one during the period here important was one George Taylor, an attorney of Bisbee, who represented McNeish in the original action and throughout the transactions later to be noted.

The company purchased the marble claims from Kolb and McNeish, paying the former 400,000 shares for his interest and the latter 50,000 shares for his interest. They thus became and continued at all times the largest stockholders of the company. In 1917 the Arizona Corporation Commission issued a permit to the company to sell stock to the public, and pursuant thereto there were sold some 56,000 shares.

For reasons unnecessary to relate, the affairs of the company did not flourish, and McNeish, claiming that the company was indebted to him for moneys advanced and services rendered, filed an action against the company (No. 4618) in the superior court of Cochise county, on June 10, 1922, asking

judgment in the sum of $2,363.94. Summons was served on that or the following day upon Kolb as president. On June 12, 1922, a conversation occurred between Kolb and McNeish, at which the former requested the latter to hold his action in abeyance pending the outcome of certain efforts he said he was making to finance the corporation, and it was then agreed that the company should employ an attorney to file a general denial to the complaint in order to suspend further proceedings. The full extent of the understanding was a matter of dispute which will later be stated in the opinion. A general denial for the company was filed by an attorney, and the case stood in that manner until September 11, 1922, when McNeish's attorney served notice on the company's attorney that a request would be made to have the case set for trial, to which the company's attorney replied that he had appeared merely for the purpose of filing a general denial to stay proceedings, and that he had no authority to try the case but would send to Mr. Kolb by mail (Kolb being in California) a copy of the notice. This, he testified, he did. In this connection it should be added that Kolb testified that he never received any notice of the setting of the case for trial. On September 17, 1922, pursuant to the notice given the court set the case down to be tried on September 23, 1922, and on that day it was tried to the court. No one appeared for the company, and judgment was rendered for McNeish in the full amount claimed—$2,363.94.

Kolb returned from California October 16, 1922, and, as a result of several conversations he had with McNeish and Taylor (all being directors), McNeish agreed to withhold execution on his judgment for the period of one year from and after the date on which the California authorities should issue to the

company a permit to sell stock in California, an application for which it was then arranged to make. In December McNeish wrote a letter to the California commissioner to the effect just mentioned. That this much is true is undisputed, but the exact extent of the agreement was disputed, as will be later shown. Also at this time it was agreed that an application should be made to the Arizona Corporation Commission for a similar permit, the one previously secured presumably having expired, and that McNeish should go to Phoenix in that behalf; and this he did. Expense money was delivered to McNeish for the purpose. Late in 1922 permits were issued by both the California and Arizona authorities.

On January 10, 1923, a month or so after the permits were issued, Kolb came to Bisbee and undertook to hold a stockholders' meeting and elect directors other than McNeish and Taylor. A controversy arose between Kolb and McNeish, and the latter testified that Kolb repudiated McNeish's judgment and declared that the company would not pay it. The following day McNeish addressed a long letter to the president and directors of the company, a copy of which he sent to the California Commission, complaining of Kolb's actions and giving notice that he would, among other things, take execution on his judgment against the company's property. These proceedings and the notice will be mentioned more in detail later in the opinion.

On January 20, 1923, McNeish caused execution to issue, and, pursuant to notice given by the sheriff on February 17, 1923, all the company's property was sold to McNeish in payment of his judgment in full, with interest. Prior to the expiration of the six months' redemption period, and consequently before a deed had been issued by the sheriff, the company

brought this action to set aside the judgment and for general relief.

It might be added that the evidence clearly shows that Kolb was practically in control of the company at all times. At director's meetings he voted by proxy for the two absent directors, and thus had a majority of the board. This method of voting does not appear to have been contested.

It might also be added that it does not appear positively that any stock was sold under the permits secured in 1922.

In this action (No. 5029) the company attacks the judgment in case 4618 and sale thereunder on three general grounds:

First. That a part of the understanding above mentioned between Kolb and McNeish, entered into on or about June 12, 1922, was that, upon the company filing a general denial, the case would be held in abeyance indefinitely, and that McNeish violated that agreement in pressing it for trial in September, 1922, without notice to the company;

Second. That McNeish imposed on the court in Case No. 4618 by putting forth false claims as to the account due him, thereby inducing the court to render judgment against the company in an amount greatly in excess of what was really due him; and

Third. That the sale was improper at all events, because McNeish had agreed not to issue execution within one year after the California Commission had issued its permit and in violation thereof had done so within a month or two of that time.

To the complaint in this case (5029) McNeish answered under oath, generally denying all of plaintiff's material allegations, but admitting formal matters and the fact that he had recovered the judgment attacked.

The case was tried before the court, without a jury, who found that McNeish had committed no "fraud or fraudulent conduct, and did not do any

act that deceived or tended to deceive the plaintiff
and prevent it from having an adversary trial in the
lawsuit upon which said judgment was obtained''; that
''it has not been shown'' that the account forming
the basis of said judgment was false or fraudulent
or that McNeish knew it to be; that the company had
been guilty of inexcusable neglect in permitting case
4618 to be tried in its absence and in not seeking
to set aside the judgment therein within six months
after its date, especially in view of the notice served
upon the company by McNeish that he had secured
such judgment and intended to enforce it immediately.
There was no express finding relative to the agree-
ment not to issue execution within one year.

Upon these facts the court entered judgment for
the defendant, from which the company appeals.

Because all the questions raised are clearly
presented thereby, we will consider *seriatim* the three
grounds of attack made by the company upon the
judgment.

First. That, in violation of his agreement to stay
case 4618 indefinitely, McNeish took judgment with-
out notice in September, 1922.

In this connection the company's witnesses gave
testimony to the effect that McNeish had agreed that
he would hold his case in abeyance indefinitely upon
the company's filing a general denial, while McNeish's
witnesses testified that the agreement was to hold
the case in abeyance only for a period of sixty days
from that time—about June 12, 1922. The effect of
the notice admittedly served on the company's at-
torney, asking for a setting of the case for trial and
the question of the company's neglect in not appear-
ing at the trial, all depended upon the extent of the
agreement.

The court below heard the testimony and decided
the issue in appellee's favor. There being ample evi-

dence to sustain the court's finding, we will not disturb it. This is the rule in equity as well as law cases. *Donahue* v. *Babbitt,* 26 Ariz. 542, 227 Pac. 995.

Second. In support of the second ground of attack upon the original judgment (4618), namely, that the company was not indebted to McNeish at the time of the trial of that case in any sum in excess of $482, and that all the judgment above that amount was based upon the false and fraudulent representations of McNeish to the court at the first trial, the company introduced over the objection of McNeish considerable evidence tending to show the truth of the charge. McNeish offered rebutting testimony. The finding of the court, however, that it was not shown that McNeish had put in false and fraudulent claims in 4618, was no doubt predicated upon its view that such evidence was incompetent and furnished no ground of attack on the judgment.

The effect of the company's evidence really was that McNeish's judgment was secured on perjured testimony. There appear to be a few cases permitting an attack of that character, but the great weight of authority is to the contrary. If a judgment may be attacked on this ground in an independent proceeding of the character of this one, so in turn may the judgment in the second proceeding be likewise attacked. No such multiplication of litigation is permissible, except where by some form of fraud or imposition, extrinsic to the issues on trial one party prevents the other from having a fair hearing. The first ground of attack just discussed is an instance of the rule. Some of the cases are found collected in 34 C. J. 476. An excellent statement of the general rule is found in *McRitchie* v. *Stevens,* 8 Ariz. 410, 76 Pac. 478.

Third.  This ground of attack is directed against the sale rather than the judgment, and is that McNeish violated his agreement to withhold execution for one year after the California authorities should grant a permit.

While the defendant denied in his answer the existence of the agreement alleged in the complaint, it indisputably appears from the testimony of McNeish himself as well as his former attorney whom he called as a witness that such an agreement was made.  McNeish testified he had written to the California Commission as follows:

"The Dragoon Marble & Mining Company.
                    "Bisbee, Arizona, December 15, 1922.
"Fred M. Miller, Engineer, State Corporation Department,
    "Pacific Finance Bldg.
"In re Dragoon Marble & Mining Company, Los Angeles, Cal.

"Dear Sir:

"In compliance with the request made by you to A. T. Kolb, the president of the above company, that I write relative to the enforcement of the judgment which I hold against the company, I agree as follows:

"That in event a permit to sell stock is issued by your department to the above company in accordance with its application now on file in your office, that I will not for a period of one (1) year from and after the date of such issuance enforce my judgment by selling under the judgment any of the property of the Dragoon Marble & Mining Company on which it is now a lien.

"Trusting that the foregoing meets with your approval, I am,
                    "Very truly yours,
                         "J. S. McNEISH."

Notwithstanding his agreement, McNeish caused execution to issue in January and the property to be sold in February, 1923.  He justified his action as follows:

"To explain why I broke my agreement, and that this agreement that I had with Mr. Kolb, that Mr. Kolb broke it first. I wrote this letter to explain why I didn't keep up my agreement by not pressing this judgment for one year, on account of the fact that I entered an agreement with Mr. Kolb, and that Mr. Kolb broke it; told me himself that he would not put in my judgment, but put in one of his personal accounts, debts, instead of mine."

The letter referred to is dated January 11, 1923, was addressed to the president and directors of the company, and is of considerable length. In substance it states that McNeish had agreed to the extension already mentioned on the express assurance from Kolb that he would see that his judgment was satisfied from moneys received out of the first sales of stock, but that McNeish had discovered the day before (January 10th) that he had been tricked into sending his letter to the California Commission. He also states that, in lieu of his judgment, Kolb had approved certain other fraudulent claims as company debts to be satisfied from first sales of stock, and protests that the attempted stockholders' meeting of January 10, 1923, was void and the directors there chosen illegally elected. He then continues:

"Feeling that the foregoing and other acts on the part of Mr. Kolb, extending over a period of six years, justify me in the position that I am now taking, I will now advise you that I intend to proceed as follows:

"(1) As I am still the only legally elected and qualified secretary of the company, that I shall refuse to deliver the records of the corporation to any one but a secretary of a board of directors legally qualified and legally elected at a legally called and conducted stockholders' meeting.

"(2) In view that the actions of Mr. Kolb are detrimental to me as a stockholder of the company and are not conducive to the success of the corporation, I shall at once take steps to have the permit

issued by the California Corporation Commissioner and the Corporation Commission of the state of Arizona revoked:

"(3) That I shall immediately advise my attorney to proceed to collect my judgment against the corporation by levy and sale of the property of the corporation, both real and personal.

"(4) In event any of the stock of the company is offered for sale before satisfactory arrangements are made with me for the payment of my judgment, I will offer for sale on the California market all of my personal stock in the company, consisting of 50,000 shares, and will sell it for any price it will bring, even though it is not more than five cents per share.

"I am sending to the Corporation Commissioner of the state of California and to the Corporation Commissioner of the state of Arizona, for their information, a copy of this letter.

"Trusting that you will see the advisability in straightening up this matter herein complained of, I submit this to you for your consideration and action."

Conceding, but not deciding, that McNeish was justified in terminating his agreement and that he was not estopped from so doing, we must nevertheless determine whether in the exercise of his right thus conceded to sell the property under execution he measured up to the standard set by the law.

Notwithstanding his judgment, he was still the secretary and a director of the company, or at least claimed to be. He retained control of the company's books. The only other resident director was his attorney. He and Kolb had been the promoters of the company, and were its largest stockholders. Since he had secured his judgment, he had made a personal effort to secure a permit from the Arizona Corporation Commission. We have shown his participation in the proceedings of a like nature before the California Commission.

It is true that he was entitled to enforce his judgment. Not for that reason alone, however, was he absolved of his duties growing out of his relation as secretary and director. Resignation might have given such absolution, but this he did not offer.

In the early stages of the development of corporate law, the courts of this country generally held that a director could not purchase at a judicial sale the property of his corporation. Cook, Corporations, 8th ed., § 653, p. 2476.

The Supreme Court of the United States, however, refused to adopt this rule as applicable to a case where the officer purchased at a foreclosure sale for the payment of his own debt, honestly contracted, in the leading case of *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587, 23 L. Ed. 328 (see, also, Rose's U. S. Notes). There Marbury, a director, made a loan to the corporation, secured by a deed of trust on its property running to a third person as trustee. When the company defaulted, the trustee sold the property to an agent of Marbury, who later deeded it to him.

In discussing the validity of a loan by a director to his corporation, secured by a trust deed or mortgage of the company's property, the court used this often quoted language:

"That a director of a joint-stock corporation occupies one of those fiduciary relations, where his dealings with the subject matter of his trust or agency, and with the beneficiary or .party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others. *Koehler* v. *Iron Co.*, 2 Black, 715 [17 L. Ed. 339]; *Drury* v. *Cross*, 7 Wall. 299 [19 L. Ed. 40]; *R. R. Co.* v. *Maghay*, 25 Beav. 586; *Cumberland Co.* v. *Sherman*, 30 Barb. 553; *Hoffman S. Coal Co.* v. *Cumberland Co.*, 16 Md. 456."

After holding the loan valid under the circum-stances there existing, the court then passed to a consideration of the question of the validity of the purchase by Marbury at the foreclosure sale, and said:

"Defendant was at liberty to bid, subject to those rules of fairness which we have already conceded to belong to his peculiar position."

The rule of fairness to which reference is made in the last quotation is the language of the first quotation.

A case more nearly in point is *Marr* v. *Marr* (decided in 1908), 73 N. J. Eq. 643, 133 Am. St. Rep. 742, 70 Atl. 375; the opinion being written by Chancellor PITNEY. There the president loaned moneys to his corporation for the recovery of which he later brought an action and secured judgment. At the sale under execution he purchased the property for the amount of his judgment. The suit was brought to set aside the sale, or, in the alternative, to impress the property with a trust in favor of the stock-holders; the corporation having in the meantime ceased to exist.

The court acquitted Marr of any actual fraud. It appeared without dispute that Marr had urged the other stockholders to take steps to pay his claim against the company. The sale itself was duly noticed by the sheriff, and Marr did nothing to prevent the corporation from raising the necessary funds to pay his judgment or prevent a fair price being bid for the property. His sole default was his failure to give notice to stockholders, in addition to the official notice of the sheriff, that a sale was imminent. This alone was held to constitute such a breach of his duty as would vitiate the sale. The court also held that the purchase at the sale by Marr,

being for about half the value of the property, was an important, "perhaps controlling," circumstance.

In announcing the rule of fairness by which the conduct of directors in their dealings with corporations is to be measured, the court announced a doctrine almost in the same language as that of the Supreme Court in the Twin-Lick case, *supra*, saying:

"We cite the last two cases because they show that a director occupies a position of trust, or agency, for his company of such a character that all dealings between him and the company, where his interest is opposed to that of the company, will be regarded with jealousy and suspicion and subjected to the closest scrutiny, and not sustained against the stockholders, unless they are consistent with the utmost good faith and fair dealing on the part of the director."

We approve this rule as being consistent with fair dealing and affording to those most in need of it—the stockholders—the protection they should have. We have said as much in a case involving the same general question of a director's duty to his corporation.

See *Phoenix Title & Trust Co.* v. *Alamos Land etc. Co.,* 24 Ariz. 499, 506, 211 Pac. 570, 572, where we said:

"They were also directors of the corporation, and in dealing with it in an individual capacity they could do nothing detrimental to it, but were required to act in good faith, looking always to its best interests."

Applying the rule thus enunciated to this case, McNeish was charged with at least the negative duty to put nothing in the way of any effort the company might be able to make to raise funds to pay his judgment. Let us consider the facts.

McNeish knew that the only feasible plan by which funds could be acquired to pay his judgment was

through the sale of stock to the public under the California and Arizona permits. If he could not encourage such sale, he could at least refrain from discouraging it. And yet we find him on January 11, 1923, advising the company and the California Commission, not only that he intended to cause execution to issue, but also that he intended to apply for a revocation of its permit to sell stock.

But he does not stop there. He continues:

"In event any of the stock of the company is offered for sale before satisfactory arrangements are made with me for the payment of my judgment, I will offer for sale on the California market all of my personal stock in the company, consisting of 50,000 shares, and will sell it for any price it will bring, even though it is not more than five cents per share."

This is an unveiled threat to prevent the corporation from taking the only steps available to raise money by which it might pay the judgment. If McNeish ever retracted his threat, there is nothing in the record to that effect, and we can only take him at his word that he did stand ready to dump his stock on the market at a great sacrifice to defeat his own company in its plans to finance itself. And, as the holder of 50,000 shares, his threat was no idle one.

McNeish's attitude was one of unjustifiable hostility to the corporation of which he insisted on remaining secretary and director.

His bitterness toward Kolb may have been fully justified, but he might not legally appease his wrath by deliberately wrecking the corporation, as he threatened to do.

Another circumstance of importance, though perhaps not controlling, as we view it, is that the property was sold for far less than its actual value.

It is true that there was no positive testimony as to value, but it did appear that after investigations the Arizona and California Corporation Commissions issued permits to sell a large block of this stock on the market at a considerable figure, and it is a justifiable inference that this would not have been done for the development of a marble property worth no more than the $2,500 judgment against it.

An interesting question arises and must be answered. Was not the company's proper remedy a motion in case 4618 to set aside the sale under execution? It will be recalled that this suit was instituted before the redemption period expired, and consequently before the sheriff gave his deed.

It may possibly be true that, notwithstanding the right to avoid the sale arose from transactions occurring subsequent to the judgment, a motion to set aside the sale might have been entertained in the original action. Nevertheless, where, as here, the facts bring into operation some principle of equity jurisprudence warranting the interposition of an equity court, it is held generally that such court's powers may be invoked in a separate action before the sheriff's deed passes. 23 C. J. 686 (note 94) and 687 (notes 8 and 9).

Even were the rule otherwise, at this stage of the proceedings we would hesitate to turn the company out of doors for pursuing the wrong remedy. No one has been harmed. The parties are the same, and an opportunity has been afforded, for a complete exposition of the facts, equal at least to the means provided by a motion in the other cause. The Michigan court took a liberal view of a somewhat similar situation in *Butters* v. *Butters,* 153 Mich. 153, 117 N. W. 203.

We must not be taken as encouraging independent suits where motions in the original action will lie,

and we are holding here no more than that on the facts of this case this independent proceeding is maintainable.

We deem it fair to say that the point on which the judgment of the lower court is reversed was very inadequately presented to the learned trial judge. Counsel for the appellant in the trial stressed his attacks upon the judgment itself rather than upon the sale.

The judgment of the lower court is reversed, with instructions that judgment be entered decreeing the possession and ownership of the property in the appellant, subject to the lien of the appellee's judgment, less any proper credits, to be enforced in Case No. 4618, as the appellee may be advised.

McALISTER, C. J., and ROSS, J., concur.

NOTE.—LOCKWOOD, J., deeming himself disqualified, Honorable GERALD JONES, Judge of the Superior Court of Pima County, was called to sit in his stead.