[Civil No. 3538.   Filed April 8, 1935.]

[43 Pac. (2d) 196.]

MONTEREY WATER COMPANY, a Corporation, Appellant, v. ANSON A. VOORHEES, Appellee.

Mr. Evo De Concini and Mr. George O. Hilzinger, for Appellant.

Mr. John W. Ross and Mr. William Spaid, for Appellee.

LOCKWOOD, C. J.—This action was brought by the Monterey Water Company, a corporation, against Harry F. Bryant and Anson A. Voorhees to cancel a certain promissory note in the sum of $2,723.39 made by the Monterey Water Company on June 30, 1932, payable to the order of Bryant, and by the latter transferred to Voorhees about October 1, 1932. The cancellation was sought on the ground that there was no consideration for the note, and that Voorhees was not a holder in due course, the whole transaction leading up to its issuance constituting fraud perpetrated by Bryant upon the plaintiff. Bryant failed to answer, and default was duly entered against him. Voorhees answered denying the allegations of the complaint, and filed a cross-complaint seeking to enforce the liability of the Water Company on the note. The case was tried to the court, which made its findings of fact, and as conclusions of law therefrom held that the Water Company should take nothing by its complaint, and that Voorhees was entitled to judg-

ment for the principal sum of the note and interest, and foreclosed an attachment lien which had been levied by the latter on the property. From this judgment an appeal was taken.

The actual facts as to the execution of the note in question and the matters leading up thereto are not seriously in dispute, the real question being the rights of the parties, as shown by these facts. It is admitted by both parties, and was found by the trial court, that Voorhees was not a holder in due course of the note in question, and the Water Company may make the same defenses against him as it would have made against Bryant, the original payee. In making a statement of facts we adopt, in substance, the findings of the trial court, and add thereto those facts in regard to which the court made no findings, but which, in our opinion, are necessary to a proper determination of the case and are shown beyond any reasonable doubt by the evidence.

For several years before 1928 Bryant was actively engaged in business in Tucson, and among other things in the development of certain real estate known as the Monterey Tract, near the city. As incidental to this development, he had put in a water plant to supply the tract. For some time this plant was owned by him individually, and carried on as a part of his private business. All its expenses were paid from his private funds, and all its receipts went into his personal bank account. In the year 1925 he had a bookkeeping system set up by an expert in which he segregated several of the enterprises in which he was engaged, the water system being at first carried as part of his general ledger account, and the profits and losses thereof not being segregated from that account. In 1928 for some reason he decided it would be advisable for him to carry the water system in

corporate form and plaintiff was duly incorporated under the laws of Arizona by him. On the 6th of December of that year the incorporators, Bryant, his wife, and A. R. Conner met, each being the holder of one share in the company, chose themselves as directors, and as directors immediately chose Bryant as president, his wife as secretary-treasurer, and Conner as vice-president, adopted a set of by-laws and adjourned. On July 8, 1929, there was held a second meeting of the board of directors of the Water Company at which it was agreed that the Water Company would purchase from Bryant his entire water system for $43,000, to be paid in capital stock of the Water Company at a par value of $100. Four hundred thirty-one shares of the stock were issued to Bryant, and one share each to his wife and to Conner. From this time on but one meeting of the board of directors was ever held, this being the special one of June 30, 1932, which we shall discuss at a later time in this opinion. No meetings of the stockholders were ever held until the 3d day of March, 1933, at which time the Bryants and Conner resigned as directors in the corporation, all of the stock at that time having passed to other parties. No change was made in the actual management of the water system after its purported sale to the company. Bryant handled the whole system just as he had when the title was in himself individually, collecting the rentals and paying the necessary expenses of maintenance. The receipts were deposited in his private general bank account, and all bills were paid therefrom by his personal checks. He did, however, at some time shortly before the incorporation of the company, the first entry apparently being some time in the summer of 1928 open a separate account marked "Water" in his private journal, showing on the one side the gross water rentals for the month,

and on the other the gross payments for electric power. These were the only regular monthly entries, though occasionally there were other small expense items, and no attempt was made to show salary payments or a balance in the account. The only account books that were ever purported to be kept by the corporation itself were a general ledger and customers rental account, the entries in the ledger beginning with the year 1930, and the first entries in such ledger referring to salaries being apparently made after and as a result of the meeting of the board of directors on June 30, 1932, to which we shall refer again at a later time. The corporation, as required by law, made a report to the Corporation Commission during 1931 as to its business during the year 1930, and in said report, which was sworn to by Bryant, stated that the corporation had no debts on December 31, 1930.

Thereafter Bryant for some reason decided to make a personal loan and went to Evo De Concini for this purpose, which loan was consummated November 21, 1931, and Bryant, as collateral security therefor, pledged to De Concini all of his stock in the Water Company. At this time Bryant represented to De Concini that the Water Company owed nothing to anybody. Some time thereafter it became apparent to Bryant that he would be unable to meet the payments upon his note to De Concini, and on June 30, 1932, and at a time when he was in default in payments on the note, a special meeting of the board of directors of the Water Company was held. At this time Bryant presented a statement of the financial condition of the company which showed, among other things, an indebtedness to him for supplies which he claimed he had purchased for the company from his own personal funds amounting to $2,723.39 and that

he had retained from the funds of the company for salary for the years 1929, 1930, 1931, and for 1932 up to June 30th, $7,200, being at the rate of $200 per month from July 1, 1929. The board of directors, consisting, as we have said, of Bryant, his wife, and A. R. Conner, voted that the company execute its note in favor of Bryant for the sum of $2,723.39 in payment of the indebtedness he claims it owed him, which was approved, and then made a contract with him for five years from July 1, 1932, at the rate of $200 per month to act as manager of the Water Company, he to have the right to give so much of his time to his outside affairs as he thought proper, so long as he attended to the business of the Water Company, and the meeting adjourned.

Bryant continued in default, and De Concini was finally forced to sell the pledged stock, according to law, he buying it in, and in March, 1933, Bryant passed out of control of the company and De Concini took control, a new board of directors being chosen. The contract of employment of Bryant, above referred to, was canceled, and some time thereafter this suit was brought.

All these facts were developed at the trial. It also appeared that Bryant never at any time did any work for the Water Company except the bookkeeping, collection and payment of bills, and the reading of meters, any other necessary work being hired, and that he devoted at the most from six to eight hours per month to this work.

There are fourteen different assignments of error, but we think it best to discuss the case from the standpoint of the general principles of law raised by the record and these assignments, rather than to take them up seriatim.

This is primarily an equitable proceeding and is governed by the general principles of equity. The first of these which we think applicable, in order to reduce an apparently complicated situation to more elementary terms is the familiar maxim that "equity looks to the substance and not to the form." Either the Monterey Water Company was a *bona fide* business corporation and as such subject to the various rules of law applying to corporations under the circumstances as detailed above, or else it was merely the "*alter ego*" of defendant Bryant and governed by very different legal principles. Counsel for both plaintiff and defendant seem to recognize the peculiar situation in their briefs for they at times apparently consider the company from the one standpoint and at times from the other. We think it, however, unnecessary for us to determine which it really was, for, as we look at it, the ultimate result would be the same under any circumstances, although it would be reached by different roads.

Let us consider the case first on the theory that the Water Company was merely the "*alter ego*" of Bryant. In such case, and substituting Bryant himself for the company whenever the latter appears, the facts may be summarized as follows: Bryant was the owner of a water system which he operated as an integral part of his private business, intermingling the receipts in his general bank account and paying the bills therefrom. While he kept books in such a manner that he could perhaps determine whether the system was on the whole profitable, he did not attempt, until June 30, 1932, to segregate the profits or losses from his general business. If there were any profits he kept them as part of that business, and if there were any losses he made them up from the same source. In 1931 he found it necessary to borrow

money from De Concini, and as a result thereof gave him what was in effect a mortgage on the water system which he owned. Some months later, discovering that he would be unable to pay off the note, he endeavored to encumber the mortgaged property by imposing certain liens upon it which were not liens at the time he mortgaged it to De Concini, to wit, the cost of certain meters and pipe which he had voluntarily put into the water system while he still owned it, and a claim for back salary for his work in taking care of his own property. It is clear that this could not be done so as to defeat the lien of the equitable mortgage of De Concini, and any note given as evidence thereof would be void for lack of consideration in Bryant's hands, and a court of equity would declare the note canceled. Since it is admitted that the rights of Voorhees were not superior to those of Bryant he would be in no better position as a holder of the note than would Bryant be.

■■ If, however, we take the other horn of the dilemma, and assume that the Monterey Water Company during all this time was a *bona fide* business corporation, and Bryant in his relationship to that corporation was to be held to the same rules as any other officer and director of a corporation who claims that there is a debt owing to him from the corporation, we think he is in no better position. His sworn statement to the Corporation Commission, which is a matter of public record and has as one of its purposes to give notice to the public in general of the condition of the corporation making the report, is binding upon him so as to estop him from claiming any indebtedness to be due him from the corporation for a period antedating that of the report. This would exclude some $2,000 of the $2,700 claim for supplies alleged to have been furnished by Bryant

to the corporation, and the claim for salary prior to 1931. After January 1, 1931, Bryant claimed as due him from the corporation $2,400 in salary for the year 1931, and $1,200 as salary for the year 1932, up to June 30th, and in his statement to the company, made on the last-mentioned date, and accounting for the money which came into his hands as president and general manager, in order to obtain a balance he was compelled to include this $3,600 of salary as retained by him.

██ We consider, then, as to whether this salary is a legitimate claim against the corporation. No salary for this period was ever formally authorized by a vote of the stockholders or directors, Bryant's claim therefor thus having no basis except such as may be implied by the approval of the account rendered by him to the board of directors on June 30, 1932. Ordinarily the approval of an account rendered by a general manager would be considered an approval of the board of directors of any salary for which he claimed credit in his account. It appears, however, that the particular board of directors which approved this account was unquestionably dominated by Bryant. Under such circumstances the account may be questioned by the stockholders at any time before the statute of limitations has run, and in order to sustain its approval it must appear that it was in all respects fair to the corporation and made in the utmost good faith. *Garden Development Co.* v. *Warren Ranch,* 35 Ariz. 254, 276 Pac. 839; *Dragoon Marble etc. Co.* v. *McNeish,* 28 Ariz. 96, 235 Pac. 401; *Phoenix Title & Trust Co.* v. *Alamos Land & Irr. Co.,* 24 Ariz. 499, 211 Pac. 570. The chief item of the account which is questioned by the present stockholders of the corporation is the salary of $200 per month, and it is urged that a salary of this amount for the six or eight hours

of labor per month which is the maximum Bryant admittedly devoted to the affairs of the corporation is unjust and exorbitant, and is governed by the rule laid down in *Martin* v. *Santa Cruz Water Storage Co.,* 4 Ariz. 171, 36 Pac. 36. This was a case where the secretary of the corporation was voted a salary by the board of directors under circumstances which made his vote as a director necessary to approve the action of the board. The salary was not paid in full and suit was brought to enforce its payment. The court in passing on the transaction said as follows:

" . . . Unless this transaction was ratified by the corporation or shareholders in an unequivocal, clear, substantive act done in full view of the material facts, it would be a reproach to the administration of justice to suffer a recovery. The appellant was a director of the corporation, and intrusted with its interest in a fiduciary capacity. He owed to his principal his fair, impartial, and disinterested judgment in fixing the salary of its secretary. The corporation had the right to demand of him his entire vigilance in its behalf. It is intolerable that an agent be suffered to act at the same time, in the same matter, for himself and principal too. The result of such a course, if allowed, would be manifest. The act of a fiduciary agent in dealing with the subject-matter of his trust or the interest intrusted to his care and keeping to his own individual gain and profit is viewed by the courts with great jealousy, and will be set aside on slight grounds. The doctrine is founded on the soundest morality, and is frequently recognized. *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587 [23 L. Ed. 328]. All transactions so tainted are voidable without regard to the fairness or honesty of the act, *Graves* v. *Mining Co.,* 81 Cal. 303, 22 Pac. 665, and so a director of a corporation cannot vote himself a salary. *Ward* v. *Davidson,* 89 Mo. 445, 1 S. W. 846; *Butts* v. *Wood,* 37 N. Y. 317. The rule is enforced with great rigor against officers voting themselves salaries. Thompson on Liability of Officers, 351. They cannot prop-

erly act on, nor form part of a quorum to act on, a proposition to increase their compensation. *Bank* v. *Collins,* 7 Ala. 95. Certainly they cannot vote themselves 'back pay.' It is like giving away the assets of a corporation. Cook on Stocks and Stockholders, sec. 657, p. 756; *Holder* v. *Railroad Co.,* 71 Ill. 106, 22 Am. Rep. 89. If they sue for the salary so created, they must recover upon an express contract to pay. They cannot recover *quantum meruit. Jones* v. *Morrison,* (31 Minn. 140) 16 N. W. 854. There are many authorities to the same import. *Gardner* v. *Butler,* 30 N. J. Eq. 702; *Goodin* v. *Canal Co.,* 18 Ohio St. 169 (98 Am. Dec. 95); 1 Beach on Private Corporations, par. 201. . . . ''

We are of the opinion that while the exact circumstances of the Martin case, *supra,* differed in some details from those of the present one, the same principle applies to both, and if we are to consider the Water Company as an ordinary business corporation, we are satisfied that the salary approved by the board of directors at its meeting of June 30, 1932, was exorbitant and excessive for the duties performed to an extent far beyond the amount claimed by Bryant to be due him after January 1, 1931, for supplies furnished, and was, as a matter of law, fraudulent and subject to repudiation by the stockholders. The bringing of this suit is such repudiation. Such being the case, he was indebted to the corporation rather than the corporation to him, and the note was therefore without consideration.

It appears, therefore, that whether we consider the case on the theory that Bryant himself was the real party in interest all the way through, or assume that the Water Company was a *bona fide* independent corporation with all the rights and duties of such, the trial court erred in its conclusion of law that there was a valid consideration for the note.

Such being the case, the judgment of the superior court of Pima county is reversed and the case remanded, with instructions to render judgment canceling the note in question.

McALISTER and ROSS, JJ., concur.